[No. 10313. En Banc. February 25, 1993.]

*In the Matter of the Disciplinary Proceeding
Against* RICHARD A. PETERSEN, *an
Attorney at Law.*

*Richard A. Petersen,* pro se.

*Maria S. Regimbal,* for Bar Association.

SMITH, J. — This matter is before the court upon its direction to Respondent Richard A. Petersen, an attorney at law, to show cause why he should not be disbarred, contrary to a recommendation by a majority of the Disciplinary Board of the Washington State Bar Association for a suspension for 2 years followed by probation for 2 years. We disagree with the recommendation of the Disciplinary Board and order that respondent be disbarred.

QUESTION PRESENTED

The sole question in this case is whether the appropriate sanction for Respondent Petersen should be disbarment instead of the 2-year suspension and 2-year probation recommended by the Disciplinary Board.

REVIEW OF FACTUAL HISTORY

Respondent Richard A. Petersen (Respondent) graduated from Gonzaga University Law School in 1975. He was admitted to the Washington State Bar in 1978.[1] In February 1986, he was appointed by the Clark County Superior Court to represent defendant James Michael Dykgraaf in a capital case, *State v. Dykgraaf.*[2] After the trial, Respondent pre-

---

[1]Transcript of Proceedings vol. I, at 57-59 (July 12, 1990).

[2]Transcript of Proceedings vol. I, at 57-59 (July 12, 1990). *State v. Dykgraaf,* Clark Cy. cause 86-1-00111-5 (Oct. 30, 1986).

pared a motion for payment of criminal defense costs. The Superior Court issued an order authorizing payment in the amount of $6,827.25.[3] A claims warrant was issued to Respondent on January 21, 1987.[4] He did not deposit the funds into a trust account and instead kept the draft for about a week.[5] He testified that he cashed the warrant, that he was overdrawn at his bank, that $1,600 from the warrant was used to cover the overdraft, and that he kept the remaining $5,200. He said he does not know what he did with the money and that he kept no records. He testified that he was fairly certain he used the money to pay his answering service, telephone bill, and other business expenses. He further testified that some of the cash was used for personal expenses. He claims that some of the defense vendors in the *Dykgraaf* case were paid from the cash, although he has no records of payment and does not remember how the vendors were paid.[6]

In February or March 1987, Arthur Curtis, Clark County Prosecuting Attorney, was contacted by several of the Dykgraaf defense vendors inquiring about payment of their fees.[7] He contacted Respondent Petersen by telephone and

---

[3]*State v. Dykgraaf, supra.*

[4]The claims warrant was to pay the following providers for their services: Clark College, Dr. Nathan Cogan, Dr. Edward Colbach, Dr. Linda Conaway, Ms. Mary Jadwisiak, Kaiser Permanente, William Kittleson, Dr. Kevin McGovern, Dr. Guy Parvaresh, Richard Petersen and Ms. Barbara White-Davis.

[5]Transcript of Proceedings vol. I, at 64 (July 12, 1990). Petersen knew the funds were not his.
"Q: [MS. REGIMBAL, BAR COUNSEL] At the time you received it, did you understand that this Claims Warrant was for the Dykgraaf expert witnesses?
"A: [MR. PETERSEN] Sure.
"Q: What did you do with the draft?
"A: I kept it for a week or so. I don't recall how long, but about that, and then I took it and cashed it at my bank."

[6]Transcript of Proceedings vol. I, at 68-69 (July 12, 1990).

[7]Transcript of Proceedings vol. I, at 134 (July 12, 1990).

letter and was told by him in mid-March that the matter had been taken care of.[8]

In April 1987, the prosecuting attorney referred the matter to Gregory P. Canova, senior assistant attorney general for the State of Washington and chief of the Criminal Division. Mr. Canova testified that records subpoenaed from Respondent Petersen's bank showed that the Clark County claims warrant was deposited in his account, which was not designated as a trust account. Mr. Canova said the activity in the account during that period was for Respondent Petersen's personal and business expenses, such as rent, payment of office telephone bills and bar expenses.[9] Mr. Canova said no checks were issued to the Dykgraaf defense vendors.[10] In 1987 and 1988, Respondent Petersen filed false declarations of compliance with the Washington State Bar Association (Bar Association) concerning his trust account.[11]

In February 1989, Respondent Petersen contacted the Bar Association and informed it that he was under criminal investigation for his conduct relating to payment of the Dykgraaf defense vendors.[12] He was instructed by Ms. Maria S. Regimbal, bar counsel, to provide the Bar Association with his records relating to the Dykgraaf funds. Correspondence from the Bar Association to Respondent during the

---

[8]Transcript of Proceedings vol. I, at 136 (July 12, 1990).

[9]Transcript of Proceedings vol. I, at 16-17 (July 12, 1990).

[10]Transcript of Proceedings vol. I, at 18 (July 12, 1990). On October 19, 1988, Mr. Canova received two cashier's checks from Petersen's attorney, Steven Thayer. Mr. Thayer indicated that Respondent Petersen found the checks in his files and was giving them to Mr. Canova as evidence of his attempt to pay the defense vendors.

[11]Transcript of Proceedings vol. I, at 73 (July 12, 1990); vol. II, at 240 (July 13, 1990).

[12]Transcript of Proceedings vol. I, at 34-35 (July 12, 1990). Generally, a dispute concerning nonpayment of expert witness fees by an attorney should not be resolved in an attorney discipline proceeding. *In re Witteman,* 108 Wn.2d 281, 737 P.2d 1268, 108 A.L.R.4th 677 (1987). This case involves not merely a fee dispute, but criminal conversion by an attorney of a court authorized claims warrant issued to pay defense vendors.

following 10 months repeatedly made the same request, but he failed to provide any records.[13] In April 1990, Respondent met with the Bar Association. He had prepared several checks, but was instructed to pay the vendors direct pursuant to Bar Association policy. Ms. Regimbal had received no evidence that the vendors had been paid.[14] At the time of Respondent's hearing before the hearing officer on July 12, 1990, the vendors still had not been paid. He stated that he had mailed a check to one of them on July 11, 1990.[15] At the time of his hearing before the Disciplinary Board in December 1990, he still had not paid all amounts owed to the Dykgraaf vendors.[16]

In mid-1986, Respondent was appointed by the Clark County Superior Court to represent Glenn H. Budd, who was charged with unlawful issuance of checks to Fred Meyer, Inc., in *State v. Budd*.[17] In July 1986, Mr. Budd delivered $530 to Respondent's office for restitution to Fred Meyer, Inc.[18] Respondent did not deposit the money in his trust account until October 20, 1987.[19] He said he had kept the money in his files.[20] He received repeated reminders from the Clark County Prosecuting Attorney about the Fred Meyer restitution. Respondent did not pay the restitution to Fred Meyer until November 1988.[21] This matter was also referred for investigation to Assistant Attorney General Canova by the Clark County Prosecuting Attorney.

---

[13]Transcript of Proceedings vol. I, at 42 (July 12, 1990).

[14]Transcript of Proceedings vol. I, at 44 (July 12, 1990).

[15]Transcript of Proceedings vol. I, at 71 (July 12, 1990).

[16]Transcript of Proceedings, at 5 (Jan. 11, 1991).

[17]Clark Cy. cause 86-1-00013-5.

[18]Findings of fact, at 36.

[19]Findings of fact, at 42.

[20]Transcript of Proceedings vol. II, at 201 (July 13, 1990).

[21]Transcript of Proceedings vol. II, at 205 (July 13, 1990).

On November 10, 1987, Respondent was appointed by the Clark County Superior Court to represent Kenneth Steiger in an appeal of a vehicular homicide and assault conviction in Clark County in *State v. Steiger*.[22] Despite repeated reminders from the clerk of the Court of Appeals, Respondent failed to perfect Mr. Steiger's appeal. He did not respond to telephone calls from Mr. Steiger's parents and failed to keep a scheduled appointment with them. When they telephoned the Court of Appeals, they were told that the case had been remanded to the Superior Court because counsel (Respondent Petersen) had failed to follow through on the appeal.[23]

Respondent Petersen claims he was depressed during the period covering his conduct in those matters. He consulted with Richard S. Keyser, a nurse practitioner in psychiatry and mental health at the Vancouver Guidance Clinic in Vancouver, Washington.[24] Mr. Keyser first started seeing Respondent in October 1988, at which time Mr. Petersen informed Mr. Keyser that he was having legal difficulties.[25] Mr. Keyser testified that he believed that, at the time of the conversion of the Clark County claims warrant, Respondent was suffering

---

[22]Clark Cy. cause 87-1-00456-2 (Nov. 10, 1987).

[23]*State v. Steiger*, slip op. at 93.

[24]Richard S. Keyser has been in practice for 18 years. He has a bachelor's degree in nursing and has had postgraduate training in psychiatry and mental health psychopharmacology. He is licensed in Oregon as a registered nurse, in Washington as a registered nurse and advanced registered nurse practitioner. He is certified by the American Nurses Association in psychiatry and mental health. He has 18 years' experience in the field of mental health. From 1980 to 1987 he was employed as a mental health professional at the Community Mental Health Center in Vancouver. In that capacity, he evaluated individuals believed to be dangerous or gravely disabled under the involuntary treatment act, petitioned for court hearings, testified as an expert witness in those matters, did evaluations for sanity and competency under RCW 10.77, and other evaluations for courts and court agencies. Since 1987 he has been in private practice, has continued to work for the courts, and also sees individuals for medication and psychotherapy. He is licensed by the State to prescribe medication within the area of psychiatry and mental health. Transcript of Proceedings vol. I, at 101-03 (July 12, 1990).

[25]Transcript of Proceedings vol. I, at 103, 105 (July 12, 1990).

from serious depression brought on by the death of his father, a heavy work load, financial difficulties and his divorce.[26] He testified that the depression started to subside in May 1987.[27] He further testified that Respondent Petersen understood that the funds did not belong to him and that he appreciated that it was wrong to take the funds.[28] According to Mr. Keyser, Respondent recognizes his obligation to make restitution, but harbors some ambivalence concerning it.[29]

In August 1989, Respondent Petersen was charged in the Clark County Superior Court with first degree theft of the Dykgraaf claims warrant and second degree theft of the Budd restitution.[30] In September 1989, he entered into a 2-year diversion agreement with the Clark County Prosecuting Attorney. It provided that Respondent would make restitution to all the Dykgraaf vendors and would see a mental health counselor twice a month for at least 1 year.[31] Respondent has not fully complied with the agreement. He has been slow making restitution and has not fully complied with his scheduled appointments with his diversion counselor or therapist.[32]

---

[26]Transcript of Proceedings vol. I, at 111, 123 (July 12, 1990). Mr. Keyser defined "major depression" as a condition of five of nine specific symptoms which occur almost every day for at least 2 weeks and which has a significant effect on normal functioning. He stated that the symptoms are depressed mood, a 5 percent increase or decrease in body weight, hyperinsomnia, agitation or psychomotor retardation, loss of interest or pleasure in normal activities, fatigue, excessive guilt, and thoughts of suicide. Although not referred to as authority, American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (3d rev. ed. 1987) (DSM-III) defines the condition similarly.

[27]Transcript of Proceedings vol. I, at 130 (July 12, 1990).

[28]Transcript of Proceedings vol. I, at 119 (July 12, 1990).

[29]Transcript of Proceedings vol. I, at 121 (July 12, 1990).

[30]*State v. Petersen*, Clark Cy. cause 89-1-00871-8.

[31]Transcript of Proceedings vol. I, at 83 (July 12, 1990).

[32]Transcript of Proceedings vol. I, at 81-84 (July 12, 1990).

In February 1990, a formal complaint was filed by the Bar Association charging the following (as summarized by the hearing officer):

Count I — Alleging respondent failed to deposit a Clark County claims warrant of $6,827.25 intended for payment of criminal defense expert witnesses, into trust, in violation of the trust account rules. (RPC 1.14)

Count II — Alleging respondent converted the Clark County claims warrant to his own use and benefit in violation RCW 9A.56.020 and ethical rules prohibiting criminal and dishonest conduct (RLD 1.1(a), 1.1(c); RPC 8.4(b), (c), (d)).

Count III — Alleging respondent failed to maintain complete and adequate trust account records of Clark County claims warrant and the use [of] those funds, in violation of trust account rules (RPC 1.14(b)(3)).

Count IV — Alleging respondent misrepresented to Prosecutor Art Curtis, that he had paid a Dykgraaf expert witness, in violation of ethical rules prohibiting dishonesty (RLD 8.4(c) and (a)).

Count V — Alleging respondent failed to promptly deposit $530 in restitution funds from a client (Glenn Budd) into a trust account in violation of trust account rules (RPC 1.14(a)).

Count VI — Alleging respondent converted Glenn Budd's funds to his own purposes in violation of the Rules for Lawyer Discipline and the Rules of Professional Conduct prohibiting criminal and dishonest acts.

. . . .

Count VI A — Alternatively alleging respondent Petersen deposited and disbursed his own funds from his trust account to pay the Glenn Budd restitution violated trust account rule[s] (RPC 1.14(a)) and RPC 8.4(c) prohibiting an attorney from engaging in conduct involving dishonesty.

Count VII — Alleging respondent failed to promptly pay the victim retailer, restitution as directed by his client, Mr. Budd, in violation of trust account rules requiring prompt disbursal of client funds (RPC 1.14(b)) and competency rules (RPC 1.3)).

Count VIII — Alleging respondent failed to promptly forward restitution to the victim-retailer and ensure prompt dismissal of the criminal charges against Mr. Budd, in violation of ethical rules requiring an attorney to act with reasonable diligence and promptness in representing a client. (RPC 1.3)

Count IX — Alleging in spring 1987, respondent filed a false 1986 trust account declaration of compliance in violation of ethical rules prohibiting dishonesty (RPC 8.4(c)).

Count X — Alleging in spring 1988, respondent filed a false 1987 trust account declaration of compliance in violation of ethical rules prohibiting dishonesty (RPC 8.4(c)).

Count XI — Alleging respondent provided bar counsel false information on February 16, 1989, by advising her that he had paid restitution to all Dykgraaf defense vendors in violation of ethical rules prohibiting dishonesty (RPC 8.4(c)).

Count XII — Alleging respondent failed to produce his trust account records and books when requested by bar counsel during the investigation in violation of disciplinary rules requiring an attorney to cooperate in an investigation, and to produce records when requested (RLD 2.8).

Count XIII — Alleging respondent failed to perfect a criminal appeal on behalf of client Kenneth Steiger in violation of ethical rules requiring competent and diligent representation of clients (RPC 1.1 and 1.3).

Count [XIV] — Alleging respondent failed to communicate with client Steiger and his parents regarding the status of the appeal in violation of ethical rules requiring an attorney to keep a client reasonably informed about the status of a matter (RPC 1.4).

Count XV — Alleging respondent's conduct as outlined above demonstrated unfitness to practice law.

Findings of fact and conclusions of law, at 1-4.

A hearing was held on July 12 and 13, 1990, before Dennis R. Colwell, hearing officer. Respondent Petersen appeared without counsel and represented himself. The hearing officer considered *ABA Standards*[33] 4.11, 5.11, 4.14 and 4.44 and aggravating and mitigating factors in the case, and entered the following findings of fact and conclusions of law:

[Findings of Fact]

1. In 1986, respondent Richard A. Petersen was appointed to represent the criminal defendant in a murder case, *State of Washington v. James Michael Dykgraaf*, Clark County Case No. 86-1-00111-5.

2. During his representation of Mr. Dykgraaf, respondent Petersen retained the services of various professionals to assist him in trial preparation and/or to appear as expert witnesses at Mr. Dykgraaf's trial.

3. In fall 1986, respondent Petersen represented defendant Dykgraaf in the criminal trial. On September 23, 1986, the jury returned a verdict of guilty of aggravated murder in the first degree for defendant James Michael Dykgraaf.

4. During the pendency of the Dykgraaf criminal trial, the professionals (hereafter the Dykgraaf Defense Vendors) who provided services to assist in the preparation of the defense of

---

[33]American Bar Ass'n, *Standards for Imposing Lawyer Sanctions* (1986).

James Dykgraaf, sent respondent Petersen invoices for their professional services.

5. On December 30, 1986, respondent Petersen filed a Motion and obtained an Order Authorizing Payment to the Dykgraaf Defense Vendors from the Clark County Superior Court.

6. On or about December 30, 1986, respondent Petersen filed the Order Authorizing Defense Services (ASSOC EX 2) with the Clark County Clerk and submitted a claim voucher for payment (ASSOC EX 3).

7. On or about January 27, 1987, the Clark County Treasurer issued a claims warrant, payable to respondent Richard Petersen, in the sum of $6,827.25, for the benefit of the Dykgraaf Defense Vendors (ASSOC EX 1).

8. On or about January 29, 1987, respondent Petersen presented the claims warrant (ASSOC EX 1) at a U.S. Bank branch in Oregon. Respondent Petersen did not deposit the claims warrant into a trust account.

9. At that time respondent Petersen deposited $1,600 of the claims warrant into his general account at the U.S. Bank of Oregon, account #136019358. Respondent Petersen also received cash from the warrant in the sum of $5,200, on that date. Respondent knowingly used those proceeds to pay personal expenses including his child support obligation, office rental, office telephone, and other business related expenses. No direct evidence was submitted that respondent Petersen used those proceeds to pay any of the Dykgraaf vendors.

10. In January or February 1987, respondent Petersen paid Dykgraaf Defense Vendor, Linda Conway [sic], Ph.D, $600 for her professional services in the Dykgraaf proceeding.

11. On or about February 3, 1987, respondent Petersen paid Dykgraaf Defense Vendor, Mary Jadwisiak, $476 for her professional services in the Dykgraaf proceeding.

12. On or about February 20, 1987, Dykgraaf Defense Vendor, Kevin McGovern, Ph.D., wrote respondent Petersen a letter requesting payment of $2,155.20, for his professional services in the Dykgraaf trial. The letter reflected Dr. McGovern's belief that respondent Petersen had received funds from the County for his payment of McGovern's professional services (ASSOC EX 21).

13. In January or February 1987, respondent Petersen paid Dykgraaf Defense Vendor, William Kittleson, $933.00 for his services in the Dykgraaf case.

14. On or about February 23, 1987, Dykgraaf Defense Vendor, Guy Pavaresh [sic], MD, wrote respondent Petersen and inquired who he should contact regarding payment of his professional services bill for the Dykgraaf trial.

15. On or about March 2, 1987, Guy Pavaresh [sic], MD, again wrote respondent Petersen and advised him that he was

aware that respondent Petersen had received funds from the County on his behalf and on behalf of other Dykgraaf Defense Vendors. Dr. Pavaresh [sic] requested respondent Petersen to pay the bill for services or he would file a bar complaint.

16. As of February or March 1987, the Clark County Prosecutor, Art Curtis, was aware that respondent Petersen had received funds from the County for the Dykgraaf Defense Vendors.

17. On or about March 9, 1987, respondent Petersen falsely advised the Clark County Prosecutor, Art Curtis, that he would pay the Dykgraaf Defense Vendors.

18. On or about March 19, 1987, respondent Petersen advised Clark County Prosecutor, Art Curtis, that he had paid Guy Pavaresh [sic], MD, for his services in the Dykgraaf trial.

19. On March 24, 1987, Clark County Prosecutor, Art Curtis, wrote respondent Petersen and advised him as of that date, Dr. Pavaresh [sic] had not received payment from respondent Petersen. Mr. Curtis advised respondent Petersen that he felt compelled to go forward with the matter. (ASSOC EX 13)

20. On March 30, 1987, Nathaniel Cogan, Ph.D., brought suit against respondent Petersen in Small Claims Court for the defense services he had provided in *State v. Dykgraaf.* (ASSOC EX 22) Dr. Cogan was to have been paid from the funds in the Clark County warrant.

21. On or about April 7, 1987, Prosecutor Curtis, contacted Washington State Assistant Attorney General, Greg Canova regarding his concerns about the Clark County claims warrant that had been issued to respondent Petersen for the payment of the Dykgraaf Defense Vendors.

22. In 1987, the State Attorney General's Office undertook the investigation of this matter, which was later expanded to include the issue of the Glenn Budd restitution. (See below) Respondent Petersen was clearly aware that such investigations were underway and that criminal charges could be filed by August 1988, when he sought to be appointed as counsel in a capital case, *State v. Stein.* In August 1988, there was a discussion in chambers between the bench, respondent and the prosecutor in *State v. Stein* regarding both the Dykgraaf vendors and the Glenn Budd restitution.

23. On or about June 4, 1987, Nathaniel Cogan, Ph.D, a Dykgraaf Defense Vendor, obtained a default judgment of $371.27 against respondent Petersen for Dr. Cogan's services in *State v. Dykgraaf.* (ASSOC EX 22, 23)

24. Respondent Petersen received notice of Dr. Cogan's judgment on or about June 4, 1987.

25. On or about October 23, 1987, respondent Petersen purchased a number of cashier's checks for payment of Dykgraaf Defense Vendors, that remained unpaid as of that date. He used personal funds to purchase these cashier's checks.

26. Although respondent Petersen purchased a cashier's check payable to Clark College in the sum of $30, and a cashier's check payable to Kaiser Medical Center in the amount of $50.50, he did not deliver these funds to Clark College, nor to Kaiser Medical Center at that time or thereafter.

27. Respondent Petersen may have left the checks in his desk. In October 1988, Steven Thayer, Mr. Petersen's counsel for *State v. Petersen*, delivered these two original cashier's checks to State Assistant Attorney General, Greg Canova. At all times, Mr. Canova considered the checks to be evidence; he did not consider the delivery to him to constitute restitution. At no time did Mr. Canova advise Mr. Petersen or his counsel that the delivery to him was to be considered restitution, or that he would deliver the checks to the payees, Clark College and Kaiser Medical Center.

28. In October 1987, respondent Petersen delivered cashier checks, in the sum of $1,550 to Guy Pavaresh [*sic*], MD, and in the sum of $580 to Edward Colbach, MD, as payment of their fees for professional services in *State v. Dykgraaf*.

29. On or about January 19, 1988, attorney John M. Davis of Port Orchard, Washington, wrote respondent Petersen on behalf of Barbara White-Davis, a Dykgraaf Vendor. (ASSOC EX 25)

30. In December 1989, and thereafter, state bar counsel reminded Mr. Petersen that the restitution to Ms. White-Davis, Kaiser Medical Center, and Clark College remained outstanding.

31. Thereafter respondent Petersen advised state bar counsel and his diversion officer that he would pay the restitution to Ms. White-Davis, Clark College and Kaiser Medical Center.

32. At the July 12, 1990 hearing, respondent testified that on July 11, 1990, he had mailed a personal check for $240 to Barbara White-Davis.

33. Ms. White-Davis did not receive this check as Mr. Petersen had addressed it to her husband, John Davis, attorney at law, Port Orchard, Washington, without a street address. (ASSOC EX AA)

34. This check was returned to respondent Petersen and he forwarded a new personal check for $240 to Ms. White-Davis on August 2, 1990, which she ultimately negotiated. (ASSOC EX CC)

35. In 1986, respondent Petersen was appointed to represent the defendant in *State of Washington v. Glenn H. Budd*, Clark County Superior Court Cause #86-1-00013-5, relating to Mr. Budd's issuance of NSF checks to Fred Meyer, Inc.

36. In July 1986, Glenn H. Budd delivered $530 cash to respondent Petersen's office for payment of restitution to the victim, Fred Meyer, Inc.

37. Respondent Petersen did not promptly deposit these funds in a trust account, nor adequately record receipt of these funds.

38. In fall 1986, respondent Petersen on behalf of Mr. Budd, contacted Clark County Deputy Prosecutor Meyers, who was assigned to *State v. Budd*.

39. Deputy Prosecutor Meyers advised respondent Petersen to delivery [*sic*] Mr. Budd's restitution funds to Fred Meyer, Inc. and he would then request that the Superior Court dismiss the pending criminal charges against Mr. Budd.

40. In April 1987, Deputy Prosecutor Meyers again reminded respondent Petersen about payment of the Glenn Budd restitution to Fred Meyers, Inc.

41. In the fall of 1987, Mr. Budd contacted respondent Petersen regarding payment of the restitution to Fred Meyer, Inc., as he (Mr. Budd) had recently been contacted by Washington State Assistant Attorney General, Greg Canova, as part of the investigation in *State v. Petersen*, Clark County Cause No. 89-1-00871-8.

42. On October 20, 1987, respondent Petersen deposited $530 into his trust account for the benefit of Mr. Budd. The hearing officer finds that Mr. Petersen maintained these funds in his client file until the date of deposit.

43. In the fall of 1988, Mr. Petersen was reminded that there again was an issue outstanding regarding his failure to pay [*sic*] Glenn Budd restitution. (ASSOC EX 46)

44. Respondent Petersen did not arrange for payment of Mr. Budd's restitution funds to Fred Meyer, Inc. until November 1988.

45. On or about November 11, 1988, respondent Petersen issued to Fred Meyer, Inc. on behalf of Glenn Budd, his trust account check #117 for restitution in the amount of $529.83. (ASSOC EX 20)

46. In September 1989, Deputy Prosecuting Attorney Meyers arranged for dismissal of the charges against Glenn Budd, in *State v. Budd*, Clark County Superior Court Cause #86-1-00013-5. (ASSOC EX 7)

47. In spring 1987, respondent Petersen was the subject of an investigation by the Washington State Bar Association regarding his professional conduct.

. . . .

49. At that time, [April 14, 1987] respondent Petersen advised the staff investigator that he had had some emotional difficulties in the past, and had some difficulty in managing his law practice. However, he also advised the investigator that he was much better, had sought professional counseling and was attempting to conduct his practice in an appropriate and ethical manner. In 1987 and thereafter, respondent Petersen sought assistance and counseling from the Oregon Professional Liability Fund.

50. On or about May 21, 1987, respondent Petersen filed with the Washington State Bar Association his 1986 declaration indicating his compliance with RPC 1.14 (the trust account rule). (ASSOC EX 26)

51. At that time, Mr. Petersen had not handled client funds properly, and in particular, the Clark County Claims Warrant, in compliance with RPC 1.14.

52. On or about April 1, 1988, respondent Petersen filed with the Washington State Bar Association his 1987 declaration indicating his compliance with RPC 1.14. (ASSOC EX 27)

53. At that time, Mr. Petersen had not handled client funds, in particular the funds of Glenn Budd, properly or in compliance with RPC 1.14.

. . . .

55. At that time, [February 16, 1989] Mr. Petersen voluntarily advised bar counsel that the Washington State Office of Attorney General had opened a criminal investigation regarding his conduct in his handling of the Dykgraaf Defense Vendor funds and his handling of the restitution funds for his client, Glenn Budd.

56. At that meeting, respondent Petersen advised bar counsel that he had paid all the *State v. Dykgraaf* Defense Vendors, by October 1987, "out of his own pocket."

57. The hearing officer accepts respondent's testimony that at that time (February 1989) he believed all of the Dykgraaf Vendors had been paid. The hearing officer also accepts respondent Petersen's testimony that he believed that the restitution to Clark College and Kaiser Medical Center had been made through his counsel's delivery of checks to Assistant Attorney General Canova. This latter belief was incorrect and respondent Petersen was negligent in assuming otherwise.

58. Respondent Petersen's statements to bar counsel at the February 1989 meeting were not true, because at that time and thereafter, at least three of the *State v. Dykgraaf* Defense Vendors (Barbara White-Davis, Kaiser Medical Center, and Clark College), remained unpaid.

59. On February 27, 1989, respondent Petersen was requested to produce his financial records for the Washington State Bar Association in conjunction with the investigation.

. . . .

62. In fall 1989, state bar counsel made other written requests to respondent Petersen through his counsel for all relevant trust account records . . . .. No records were produced.

63. Bar counsel ultimately received some but not all of respondent Petersen's trust account records from Assistant Attorney General Greg Canova.

. . . .

65. The hearing officer accepts the respondent's testimony and the testimony of his counsel, Steve Thayer, that at the

time of the WSBA requests, respondent's financial records were chaotic or did not exist.

66. At the hearing respondent acknowledged he had been served with an RLD 4.12 Notice to Produce Documents at hearing, and he did not bring the documents to the hearing.

67. The hearing officer finds that with respect to the false trust account affidavit of compliance filed in spring 1987 (Count IX) respondent acted knowingly.

68. The hearing officer finds that with respect to the false trust account affidavit filed in spring 1988 (Count X) respondent acted negligently.

69. The hearing officer finds that with respect to respondent Petersen's conduct in February 1989 in providing bar counsel false information regarding the payment of restitution to the Dykgraaf Vendors (Count XI), respondent acted negligently.

70. In 1987, respondent Petersen represented Kenneth Steiger on charges of vehicular homicide and assault, *State of Washington v. Kenneth Steiger*, . . .. Respondent sought and was appointed to serve as Mr. Steiger's counsel on appeal.

71. On or about December 9, 1987, respondent Petersen filed a Notice of Appeal in *State of Washington v. Steiger*.

72. On or about December 15, 1987, the Clerk of the Court of Appeals, Division II . . . advised Mr. Petersen that no filing fee had been paid . . . and that the appeal would be dismissed unless a filing fee or Order of Indigency was entered. . . .

. . . .

74. . . . the clerk set a Motion for Dismissal and for further sanctions for April 20, 1988, if respondent Petersen did not perfect the appeal.

. . . .

76. On or about June 23, 1988, the Court of Appeals, Division II, issued an Order of Remand . . . for appointment of a new counsel on behalf of Mr. Steiger.

77. Subsequent to September 1987, respondent Petersen would not regularly speak with Mr. Steiger or his family regarding his case.

78. On or about August 18, 1988, Mr. Steiger's parents appeared for a scheduled appointment with Mr. Petersen. The Steigers sought the assistance of their own counsel to establish the meeting, as Mr. Petersen would not respond to their calls. Respondent Petersen failed to appear for the appointment.

79. The Steigers directly contacted the Court of Appeals — Division II and learned that their son's appeal had been dismissed and the case mandated to Superior Court.

80. Following the appointment of new counsel, Kenneth Steiger's conviction and exceptional sentence was affirmed by the Court of Appeals — Division II.

81. The record indicates that in 1987 and thereafter, Richard Petersen suffered from a depression during which he committed

all the acts for which he is now subject to discipline. The depression was brought on by the death of his father, back-to-back murder trials, including one capital case, more financial problems and the break-up of his marriage — all of which occurred in a very short period of time. The record further indicates that although a major depression abated sometime in late 1987 or early 1988, respondent Petersen has not completely recovered from his emotional problems, or more precisely he has not learned to effectively cope with his problems.

82. In spring 1987 and thereafter, respondent was under investigation by the Office of Attorney General with respect to his handling of the Clark County claims warrant. In August 1989, respondent was charged with first degree theft as to the Clark County claims warrant, and second degree theft as to the Glenn Budd restitution. (ASSOC EX 8) Immediately thereafter, respondent entered into a diversion agreement with the State with respect to such charges, and as of the date of the hearing, was still subject to that agreement. . . .

83. Although there are indications, including respondent's failure to timely make restitution, which suggests some ongoing emotional problems, the record, including respondent's skillful examination of witnesses and marshalling of evidence in this proceeding indicates that he is generally fit to practice law and to adequately, and in fact clearly, understand the charges pending against him, and the potential ramifications of this proceeding. Respondent's peers and adversaries consider him to be a skillful trial lawyer. Although the hearing officer does have some reservations about respondent's return to the private practice of law, there is no issue of disability under RLD 10.2(c) or RLD 10.2(b). . . .[34]

[Conclusions of Law]

84. Respondent Petersen's conduct in failing to deposit into trust the Clark County Claims Warrant intended as payment of the Dykgraaf Defense Vendors violated RLD 1.1(i) in that it violated the following provisions of the Rules of Professional Conduct: RPC 1.14, requiring that an attorney deposit and maintain client funds in trust. Count I is proven. With respect to this conduct, respondent acted knowingly.

85. Respondent Petersen's conduct in using the Clark County Claims Warrant funds for his own personal use violated RLD 1.1(a), in that it violated RCW 9A.56.020, and is the commission of an act involving moral turpitude and dishonesty; and violated RLD 1.1(c), in that it violated respondent Petersen's oath as an attorney to abide by the laws of the State of Washington; and violated RLD 1.1(i) in that it violated the following provisions of the Rules of Professional Con-

---

[34]Findings of fact, at 4-18. Respondent Petersen has not challenged any of the findings of fact, nor does his brief contain a statement of facts.

duct: RPC 8.4(b), prohibiting an attorney from committing a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects RPC 8.4(c), prohibiting an attorney from engaging in conduct involving dishonesty, fraud, deceit or misrepresentation and RPC 8.4(d) prohibiting an attorney from engaging in conduct prejudicial to the administration of justice. Count II is proven. With respect to this conduct, respondent acted knowingly.

86. Respondent Petersen's conduct in failing to keep adequate records of his receipt of the Dykgraaf Vendor Funds and his record of disbursal of funds to the Dykgraaf Defense Vendors violated RLD 1.1(i) in that it violated the following provisions of the Rules of Professional Conduct: RPC 1.14(b)(3), requiring that an attorney maintain complete records of all client funds, coming into his possession and render appropriate accounts regarding them. Count III is proven. With respect to this conduct, respondent acted knowingly.

87. Respondent Petersen's conduct in advising Clark County Prosecutor Art Curtis on or about March 19, 1987, that he had paid Guy Pavaresh [sic], MD, for his services in the Dykgraaf case, violated RLD 1.1(i) in that it violated the following provisions of the Rules of Professional Conduct: RPC 8.4(c), prohibiting an attorney from engaging in conduct involving dishonesty, deceit, or misrepresentation and RPC 8.4(d), prohibiting an attorney from engaging in conduct prejudicial to the administration of justice. Count IV is proven. With respect to this conduct, respondent acted knowingly.

88. Respondent Petersen's conduct in failing to promptly deposit the cash of $530 which he received from Glenn Budd in July 1986 for payment of restitution to Fred Meyers [sic], into a trust account violated RLD 1.1(i) in that it violated the following provisions of the Rules of Professional Conduct: RPC 1.14(a), requiring that all funds of clients paid to a lawyer be deposited and maintained in an [sic] trust account. Count V is proven. With respect to this conduct, respondent acted negligently.

89. The Association has failed to carry the burden of proof with Count VI, . . . and Count [VI A].

90. Respondent Petersen's conduct in failing to promptly pay a third party, Fred Meyer, as directed by Mr. Budd, violated RLD 1.1(i) in that it violated the following provisions of the Rules of Professional Conduct: RPC 1.14(b)(4), requiring that an attorney promptly pay or deliver to the client or third party client funds as directed by the client, and RPC 1.3, requiring that an attorney act with reasonable diligence and promptness in representing a client. Count VII is proven. With respect to this conduct, respondent acted knowingly.

91. Respondent Petersen's conduct in failing to ensure prompt dismissal of the criminal charges against Mr. Budd, on his pay-

ment of restitution, violated RLD 1.1(i) in that it violated the following provisions of the Rules of Professional Conduct: RPC 1.3, requiring that an attorney act with reasonable diligence and promptness in representing a client. Count VIII is proven. With respect to this conduct, respondent acted knowingly.

92. Respondent Petersen's conduct in May 1987, in filing a Declaration of Compliance with RPC 1.14, which was not true, violated RLD 1.1(i) in that it violated the rules of Professional Conduct: RPC 8.4(c), prohibiting an attorney from engaging in conduct involving dishonesty, deceit or misrepresentation. Count IX is proven. With respect to this conduct, respondent acted knowingly.

93. Respondent Petersen's conduct in April 1988 in filing a Declaration of Compliance with RPC 1.14, which was not true, violated RLD 1.1(i) in that it violated the following provisions of the Rules of Professional Conduct: RPC 8.4(c), prohibiting an attorney from engaging in conduct involving dishonesty, deceit, or misrepresentation. Count X is proven. With respect to this conduct, respondent acted negligently.

94. Respondent Petersen's conduct in providing bar counsel false information on February 16, 1989, regarding his payment of restitution in full to the Dykgraaf Defense Vendors, violated RLD 1.1(i) in that it violated the following provisions of the Rules of Professional Conduct: RPC 8.4(c), prohibiting an attorney from engaging in conduct involving dishonesty, deceit or misrepresentation. Count XI is proven. With respect to this conduct, respondent acted negligently as he believed that the restitution to Clark College and Kaiser Medical Center had been made through delivery of the checks to the Attorney General. This belief was incorrect and respondent Petersen was negligent in assuming otherwise.

95. The Association did not prove by a clear preponderance of the evidence that respondent Petersen failed to produce his trust account books and records when requested by state bar counsel as the hearing officer finds during the relevant period respondent did not maintain such records. Consequently, the hearing officer cannot conclude that it is a violation to fail to produce that which one does not have.

96. Respondent Petersen's conduct in failing to promptly perfect Mr. Steiger's appeal, and in failing to meet the mandated court deadlines which resulted in the Mandate of Mr. Steiger's case to Superior Court for appointment of new counsel, violate RLD 1.1(i) in that it violated the following provisions of the Rules of Professional Conduct: RPC 1.1, requiring that an attorney provide competent representation to a client, RPC 1.3, requiring that an attorney act with reasonable diligence and promptness in representing a client. Count XIII is proven. With respect to this conduct, respondent acted negligently.

97. Respondent Petersen's conduct as outlined above establishes unfitness to engage in the private practice of law. Count XV is proven.[35]

The hearing officer applied the American Bar Association (ABA) *Standards* and recommended that Respondent Petersen be suspended from the practice of law for 6 months and then placed on supervised probation for 2 years on the conditions (1) that he comply with the terms and conditions of his diversion program, (2) that he continue mental health counseling for the entire period of his suspension and probation, and (3) that he complete at least 30 hours of Bar Association-approved law office management Continuing Legal Education before he could again engage in the practice of law.

The Disciplinary Board on January 11, 1991, heard oral arguments on the matter and affirmed the hearing officer's findings of fact and conclusions of law. However, by a vote of 9 to 2, it determined the recommended sanction to be inadequate and instead recommended a 2-year suspension followed by 2 years of supervised probation. Board member Henry Haas dissented, contending that the case should be remanded for determination of Respondent Petersen's mental state during the time of the claimed misconduct and for additional findings concerning the existence of a clinically diagnosed state of depression. Board member C. C. Bridgewater dissented, contending that the appropriate sanction for the handling of the Dykgraaf and Budd matters should be disbarment because there were no extraordinary mitigating factors in the case.

Respondent Petersen did not appeal the ruling of the Disciplinary Board. The Board of Governors denied Bar Association counsel's request for authorization to file a petition for discretionary review. The matter was referred to this court for entry of a final order. On April 5, 1991, this court issued an order to show cause why Respondent should not be disbarred.

---

[35]Conclusions of law, at 19-26.

ANALYSIS

■ In determining the appropriate disciplinary sanction, this court applies the analytical framework provided by the American Bar Ass'n, *Standards for Imposing Lawyer Sanctions*, Std. 3.0 (1986) (*ABA Standards*).[36] Under the *ABA Standards*, three basic factors are considered in determining the presumptive sanction: (1) the ethical duty violated by the lawyer, (2) the mental state of the lawyer, and (3) the extent of the actual or potential injury caused by the lawyer's misconduct. To determine the actual sanction, we consider the further question whether there are any aggravating or mitigating circumstances.[37]

Bar counsel contends that the proper sanction in this case should be disbarment because Respondent Petersen's depression is not an "extraordinary mitigating factor" which would overcome the presumptive sanction of disbarment. Respondent contends that the suspension and probationary period imposed by the Disciplinary Board is the proper sanction because his depression is a "mitigating factor". He further contends that the sanctions imposed are sufficient to protect the public and deter other attorneys from similar conduct and that the sanctions imposed are proportional to other cases.

In following the *ABA Standards*, the presumptive sanction must first be determined. The hearing officer found that Petersen violated the following ethical duties:

Claims Warrant Conversion in Dykgraaf Case

1. RLD 1.1(i), violations of RPC 1.14 (client trust fund violations), RPC 8.4(b) (lawyer prohibited from committing a criminal act that reflects adversely on his honesty), RPC 8.4(c) (lawyer prohibited from engaging in conduct involving dishonesty, fraud, deceit or misrepresentation),

---

[36]*In re Johnson*, 114 Wn.2d 737, 790 P.2d 1227 (1990); *In re Lynch*, 114 Wn.2d 598, 789 P.2d 752 (1990); *In re McGough*, 115 Wn.2d 1, 793 P.2d 430 (1990); *In re Curran*, 115 Wn.2d 747, 801 P.2d 962 (1990).

[37]*In re Johnson, supra; In re Lynch, supra; In re McGough, supra; In re Curran, supra*.

RPC 8.4(d) (lawyer prohibited from engaging in conduct prejudicial to the administration of justice).

2. RLD 1.1(a) (commission of an act involving moral turpitude, dishonesty or corruption).

3. RLD 1.1(c) (violation of attorney oath and duties).

### Glenn Budd Case

4. RLD 1.1(i), violations of RPC 1.14(a) and (b)(4) (trust account violations), RPC 1.3 (lawyer must be reasonably diligent and prompt in representing a client).

### Steiger Appeal

5. RLD 1.1(i), violations of RPC 1.1 (lawyer must present competent representation of client) and RPC 1.3 (lawyer must be reasonably diligent and prompt in representing client).

### Washington State Bar Declaration of Compliance (1987 and 1988)

6. RLD 1.1(i), violation of RPC 8.4(c) (lawyer prohibited from engaging in conduct involving dishonesty, deceit or misrepresentation).

The hearing officer found that Respondent's mental state during the Clark County claims warrant conversion in the *Dykgraaf* case was to knowingly commit the offense; that his failure to promptly pay Mr. Budd's restitution to Fred Meyer, Inc., to ensure prompt dismissal of the criminal charges was knowingly done; that in failing to deposit Mr. Budd's restitution funds into a trust account, Respondent acted negligently; that in failing to perfect Mr. Steiger's appeal, he acted negligently; that in filing a false declaration of compliance with the Bar Association in 1987, he acted knowingly; and that in filing a false declaration of compliance with the Bar Association in 1988, he acted negligently.

The hearing officer found that the extent of the actual or potential injury caused by Respondent Petersen's violations was serious with respect to the Clark County claims warrant conversion and the Steiger representation. However, he

found little or no injury or potential injury in the Glenn Budd matter or in the false declaration of compliance filing.[38]

 The presumptive sanctions the hearing officer found applicable were disbarment as to the Clark County claims warrant conversion,[39] admonition as to the Glenn Budd matter,[40] admonition as to the Steiger appeal,[41] and reprimand as to the filing of false declarations of compliance.[42] Although the *ABA Standards* do not directly address the sanction for multiple charges of misconduct (other than to consider it an aggravating factor), they state that the "ultimate sanction imposed should at least be consistent with the sanction for the most serious instance of misconduct among a number of violations; it might well be and generally should be greater than the sanction for the most serious misconduct."[43] The most serious presumptive sanction found applicable by the

---

[38]The potential for injury in these two matters seems at least probable. "People involved in a . . . lawsuit often are in a period of emotional and financial turmoil. . . .

". . . Those clients do not need the added agitation of a neglectful, undiligent lawyer with concomitant . . . lack of information, [and] lack of reasonable progress . . .". *In re Burtch*, 112 Wn.2d 19, 26-27, 770 P.2d 174 (1989).

[39]*ABA Standard* 4.11 states "[d]isbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client." *ABA Standard* 5.11 states "[d]isbarment is generally appropriate when: (a) a lawyer engages in serious criminal conduct, a necessary element of which includes . . . misappropriation, or theft . . .".

[40]*ABA Standard* 4.14 states "[a]dmonition is generally appropriate when a lawyer is negligent in dealing with client property and causes little or no actual or potential injury to a client." *ABA Standard* 4.44 states "[a]dmonition is generally appropriate when a lawyer is negligent and does not act with reasonable diligence in representing a client, and causes little or no actual or potential injury to a client."

[41]*ABA Standard* 4.44.

[42]*ABA Standard* 5.13 states "[r]eprimand is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law."

[43]*ABA Standards*, at 6.

hearing officer, disbarment, is supported by case law, as well as by the *ABA Standards*.[44]

After determining the presumptive sanction of disbarment, any aggravating or mitigating circumstances which would affect the presumptive sanction must be considered.[45] The *ABA Standards* consider the following as *aggravating factors*:

 (a) prior disciplinary offenses;
 (b) *dishonest or selfish motive*;
 (c) a pattern of misconduct;
 (d) multiple offenses;
 (e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;
 (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;
 (g) refusal to acknowledge wrongful nature of conduct;
 (h) vulnerability of victim;
 (i) *substantial experience in the practice of law*;
 (j) *indifference to making restitution*.

(Italics ours.) *ABA Standard* 9.22.

Of these, the hearing officer found factors (b), (i) and (j) present in this case. In addition to these aggravating factors, the record shows that Respondent Petersen engaged in a pattern of misconduct involving multiple offenses.[46] Respondent's conduct included his mismanagement of the Clark County claims warrant, the Glenn Budd restitution, and the Steiger appeal, as well as the filing of false declarations of compliance with the Bar Association. He also failed to promptly respond to bar counsel's request for production of his records. Although the hearing officer stated that Petersen could not produce what he did not have, financial records were available because bar counsel later obtained the records

---

[44]*See In re McGough*, 115 Wn.2d 1, 793 P.2d 430 (1990); *In re Johnson*, 114 Wn.2d 737, 790 P.2d 1227 (1990); *In re Rentel*, 107 Wn.2d 276, 729 P.2d 615 (1986); *In re Rosellini*, 97 Wn.2d 373, 646 P.2d 122 (1982) (listing pre-*ABA Standards* cases in which trust account violations have led to disbarment).

[45]*In re Johnson*, at 746.

[46]*See In re McGough*, at 15.

from Assistant Attorney General Canova. These aggravating factors support the presumptive sanction of disbarment.

The *ABA Standards* list the following as *mitigating factors*:

 (a) *absence of a prior disciplinary record*;
 (b) absence of a dishonest or selfish motive;
 (c) *personal or emotional problems*;
 (d) timely good faith effort to make restitution or to rectify consequences of misconduct;
 (e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings;
 (f) inexperience in the practice of law;
 (g) *character or reputation*;
 (h) *physical or mental disability or impairment*;
 (i) delay in disciplinary proceedings;
 (j) interim rehabilitation;
 (k) *imposition of other penalties or sanctions*;
 (l) *remorse*;
 (m) remoteness of prior offenses.

(Italics ours.) *ABA Standard* 9.32.

The hearing officer found factors (a), (c), (g), (h), (k) and (l) in this case. Although Respondent Petersen does not have a prior disciplinary record, he has had complaints filed against him. In 1985 or 1986, he was admonished by the Maine Bar Association.[47] In 1987, he met with the Washington State Bar Association to discuss other complaints which were pending against him. These were later set aside.[48] Of the remaining factors found, those bearing the most weight are (c) personal or emotional problems and (h) physical or mental disability or impairment. The failure of a lawyer to preserve the integrity of client funds leads to disbarment absent "extraordinary mitigating circumstances."[49] The question becomes then whether Respondent's depression was an "extraordinary

---

[47]Transcript of Proceedings vol. I, at 56 (July 12, 1990). Respondent Petersen was a member of the Maine Bar. He received a letter of admonishment concerning a client's dissatisfaction with Respondent's representation of him in a Maine action when Respondent was in the state of Washington.

[48]Transcript of Proceedings vol. I, at 47 (July 12, 1990). The record does not indicate the nature of these complaints.

[49]*In re Rentel*, 107 Wn.2d 276, 286, 729 P.2d 615 (1986).

mitigating circumstance" to warrant departure from the presumptive sanction of disbarment.

Evidence in the record concerning Respondent's depression is based upon the testimony of Mr. Keyser, upon questioning by Respondent, before the hearing officer. Because of its significance to the determination of this case, it is included here:

A: We first met in October of 1988. It was in my office for an appointment. Mr. Petersen was referred to me by another attorney who practices here in town who is also a client of mine, has known Mr. Petersen for some time and was aware of the difficulties that he was having, was aware of his previous treatment and so on, had, I assume, somewhat of a personal relationship with Mr. Petersen and felt that he was in need of some, at least an evaluation at that time either for medication or for therapy, so referred him to me for that purpose.

Q: We discussed that and some of the history that I've had with regard to medication and those kinds of things. Do we have an agreement now with regard to psychiatric medication? And, if so, please tell the Hearing Officer and Bar counsel what that agreement is.

A: Okay. At the time I began seeing Mr. Petersen as a patient, I felt that the issue of medication was marginal, it could be either way, but because of negative experience with medication previously, which I attributed mostly to the care he was getting along with it, not specifically the medication, he was reluctant to do that, so we set some parameters for whether or not medication would be used.

His condition did not deteriorate to the extent that medication would be indicated, and probably four to six months later when there seemed to be symptoms of depression again, I re-established those parameters and said that if his condition deteriorated to that point, I would make it a requisite of his treatment with me that he go on medication. His condition did not deteriorate to that point, nor has it since that time.

Q: As far as that aspect of it is concerned, it's our agreement then that I'm going to leave that to your recommendation as far as whether I take any kind of medication, whether you think it's appropriate, and any persons you wish to refer me to, I would see in that regard as well?

A: That was my understanding.

Q: Okay. Since 1988, then, we've seen each other — I don't know that we've established an exact regimen, but we've seen each other fairly frequently. Could you describe the

nature of our visits and how they've taken place since that time?

A: The basic purpose of our sessions was psychotherapy. There was no medication, so it was what I would call insight oriented psychotherapy. There was a lot of time spent on gathering history and for me to familiarize myself with Mr. Petersen's circumstances.

From the first visit he made it clear that he was having potential legal difficulties and made those known to me. It was over a period of several months that I became aware of what was actually going on at the time that these potential legal problems occurred, but basically therapy was designed to relieve the stress of his current situation and to help him gain some insight into what happened and how he could avoid it in the future.

I've had an eye out for whether or not medication would be needed, because at times his symptoms seemed to get a little bit worse and I was concerned that we avoid anything that was similar to what had previously happened. And I'm talking primarily about his level of depression.

It never seemed to get bad enough. He seemed to benefit from therapy, was also while he was living in Vancouver actively involved in some other endeavors which seemed to be quite therapeutic, a men's group and going to church and so on, and so we were monitoring those activities.

Once he moved to Goldendale, those activities ceased and there was some problems with readjusting to that area and becoming engaged in some activities. He was unable to substitute similar activities. There was no men's group up there. He wasn't involved in a church. So it took some time before he adapted to the area, but was able to do that quite successfully.

At the same time also worked pretty well on some relationship issues, which although had some bearing, or what's happened here had some bearing on those relationships, there was some things that were completely separate from that. So he worked through those at the same time.

Q: Relationships, you mean relationships with —

A: Interpersonal relationships.

Q: Okay. As far as the current status of our therapy is concerned, please tell the officer exactly what we're doing at this point as far as maintenance of contact between you and I and also the freedom that you have been given to address any issues relating to my diversion with Ms. Garvin.

A: I think it was established as a condition of diversion that Mr. Petersen be seen twice a month. At the time the diversion was actually put in place, I didn't feel that he was in need of that much therapy and things seemed to be going well. It was just prior to the move to Goldendale.

The difficulty in doing twice a month was his schedule and my schedule. Unfortunately, the situation he got into, it was a very busy schedule with the prosecutor's office, so frequently we had to make appointments on last minute notice.

When things got worse and he was having some problems emotionally, he was able to spend more time in Portland and see me maybe two or three times over a period of a few days. There was a month I believe in April where he did not see me on the two occasions, and I — when Ms. Garvin called me and asked me about that, I reported it to her.

From a therapeutic standpoint — and this is the difficulty I have in working with probation orders and diversion orders and so on, is that frequently therapy is ordered as punishment, and therapy shouldn't be punishment. And so an order that says you have to go every week frequently doesn't address the therapeutic issue. It deals with the criminal justice issues. So I understand Ms. Garvin's role and her position and what she had to do.

From a therapeutic standpoint, I didn't see any harm in him being seen that one time in April. What we decided after that, or what I decided after that since it seemed like it could be, continued to be a problem — and then in May my schedule got busy enough where I even had to cancel some appointments with him to be out of town — I said let's [do it] on the phone. If we can't do it, we'll get together on the phone. And that's what we've done since then.

There was one actual appointment in June, but we talked on the phone two times in addition to that. Actually probably more than that, but two of them that I consider to be therapeutic in nature.

Q: We've — do you feel that — check this. Let me say this. Comment, please, about your understanding of my awareness of problems related to depression and whether or not you believe that I have, have a level of awareness, that I increase my contact with you when there seems to be some kind of a problem there.

A: I think that a significant part of therapy in the beginning was used to, or was to Mr. Petersen's awareness of what depression was. And what happened was that as we talked about the events that led to this proceeding today and he described what was going on at the same time, he had no idea that it was all depression or that it was a significant, a severe depression going on at that time.

He knew his mood was down, but thought that it was due to situational factors. And yet with his history and the severity of the symptoms, it was obvious that he was suffering from a major depression.

So part of therapy is designed to, as it is with any kind of therapy, even with chemical dependency treatment, is to work on relapse prevention and to educat[e] an individual to what the symptoms are and to be able to detect them at a point when they can avoid a serious disability.

And so at this point, and based on his willingness to come into therapy, as I said, for a number of sessions over a brief period of time when he was under stress, I believe at this point that he has a much better understanding of depression in general and what his particular symptoms are.

Q: Can you comment, please, on my functional level at this time as far as your awareness of that and its relationship to the performance of my job as I'm doing it now? Obviously you don't see me in my job, but you know what lawyers do. And so comment relative to that, please.

A: Okay. Well, at this time I think there is some depression and some anxiety, but it's certainly consistent with what's going on in his environment both here today and with his job. The situation with his job seems pretty stressful. But to my knowledge, his performance on the job has been at least adequate, and interpersonally he's not having the difficulties that he was when I began seeing him. And he's been able to adapt to an environment which is much different.

He lived in Portland. Now he's living in Goldendale. That's quite a cultural shock. And yet has been able to get involved in activities within the community and to occupy some of his free time. At one point he didn't have the energy to do any of those things. So there's some specific signs. And he's been working longer hours at work and so on.

The other side of that is that at times I've warned him about not overdoing it, because that's certainly a way to precipitate another depression. So, again, there's been some monitoring of his activities to make sure that he doesn't overdo it with work. Socially he hasn't overdone it. He's actually drawn back a little bit, but —

Q: Okay. I don't know whether — we haven't talked about this, and I don't know whether you can comment on it, so if you can't, say so. But if you can comment about the likelihood for me doing this kind of thing again. First of all, as it relates to misappropriation of funds and that type of thing, can you comment about that — are you able to comment about that?

A: I can to some degree. My understanding of the incident of misappropriation of funds and his mental status at the time lead me to believe in fact that he was suffering from a serious depression to the point that he was actively suicidal at times. There were days when he would contemplate dying and would plan his death. And then there would be days where that would remit.

The stress that he was going through at the time, of having done, I believe, three murder trials, two of them — I may be wrong on this, but it seems to me that a couple of them were aggravated, one of them involved the death penalty, also handling a fairly heavy felony load at the time, going through a divorce, and having severe financial difficulties, that with his mental status, I believe, made it much easier to do what he did.

I don't see it as a matter of intentionally — and, again, I don't mean to argue semantics or legal terms here. I'm not a lawyer. But I don't see it as being in the same kind of willful act as somebody walking into a convenien[ce] store with a gun and robbing it.

I see it more as the act of a desparate [sic] man, a man whose world was literally falling apart, And at the time when contemplating suicide and ending his life, felt like he had nothing to lose by doing that. That was just trying to take care of things.

One of the things that motivated him to take care of things and to stay alive at times is his daughter. And I think that's probably the single most significant factor in his recovery, is not wanting to kill himself because of his daughter.

So at this point, assuming that he doesn't get into that kind of a depression again with those kinds of stressors, I believe that the chance of something like this happening are [sic] insignificant. Whether or not he can prevent that, I believe he can. Can I say that beyond a reasonable doubt he'll do that? I don't know. I mean, I can't say that for anybody.

But I believe at this point he has an adequate understanding of his condition and what he needs to do to take care of himself. He's demonstrated a willingness and capacity to do that. I don't see it as being a problem.

Q: With regard to the particular charges — and we talked about this just yesterday — relating to restitution and dealing with immediate issues, specifically relating to this hearing today, those kinds of things, and I had indicated that I was having a hard time meeting some of, meeting necessary things relating to the specific charges here, for example, can you explain that in the context of the problems that I've had at all?

A: I've tossed this around, and you know Mr. Petersen — you don't know — Mr. Petersen and I have wrestled with this in therapy about at times his procrastination and what that means and I guess what's, as a therapist what's so frustrating is that his insight into the situation is perfect.

But his ability to deal with his other ambivalence, or whatever, I think it has more to do with the here and now.

I think it goes back to old issues of when he started practicing law, family issues — God forgive me for saying this, or mother's [*sic*] forgive me for saying this — but some strong old family stuff that I think still needs to be dealt with, and ambivalence about that.

And so it's kind of a major state of being stuck, and until he can work through that, you know, this is one of the symptoms. I don't see this as being a problem. Or not a problem. The disease. I see this as a symptom of the disease. And so those are things, you know, take time. Unfortunately, with this situation he may not have the time. But I don't see it as being a willful intent to not comply.

Q: The —

A: Fair is fair. You can ask about my mother.

Q: Right on the tip of my tongue. I can't place it. Well, I guess in summation, maybe that's what I'm looking for, a way to sum up your feelings about this. But as far as the course of conduct that the therapy is going through right now, do you feel confident about that course and that I'm compliant with it, if that's the — I guess that's the first thing I would need.

A: Well, again, being compliant with it —

Q: If I've chosen a bad word, I don't mean to hang you up on that.

A: No. Being compliant with it to me indicates are you complying with your diversion order or whoever is ordering you to be in therapy, and, you know, I have to say in April it was supposed to be two contacts and there was one. But compliant with therapy from my standpoint, you're not doing things that are endangering yourself, and you're making more than reasonable progress at therapy. So talking about compliance, then, seems to indicate an agenda of mine, which is really not therapeutic. So —

Q: Okay.

A: So I think you're making more than reasonable progress in therapy. As far as the compliance issue, it's the two times in April. That's been corrected. So if that continues to be an issue, which I assume it is for the period of diversion, than [*sic*] either you do it or you don't.

I just wanted to add one other thing. I was thinking about it, and I mentioned his daughter. It may be unimportant, but — another significant issue of therapy, and I forgot about this —

Q: You might take a break while the jet is flying over us.

A: Okay?

Q: Okay.

A: — has to do with the issue of parenting. Mr. Petersen is a single parent, but has a close relationship with his exwife and her current husband and a very close relationship with

his daughter, and that's an issue that has come up in his interpersonal relationships. Because many of the women, or several of the women — not many, but several of the women that he's associated with have been threatened by that.

And so one long-term issue was whether or not he was, there was something wrong with him because of having this reasonable relationship with his exwife. And so that was something that — it didn't get addressed directly, but it kept coming up in several different contexts, and eventually was able to work through it.

But it was something that he was very concerned about, because throughout this whole thing even when he was depressed, he wanted to be an adequate parent to his daughter, which I, of all the things that I could say about Mr. Petersen, that would be the one that I would find the most admirable.

And throughout all of this, with the exception of this incident, which I know he's not proud of, he has been a very, very good parent, and I admire that. I frequently deal with people who are just the opposite.

Q: I've now remembered the thing I'd forgotten about. We've talked about some of the issues relating to stress at the time that the funds were misappropriated, and I wanted to go over some of those so that you're sure in your mind of what was happening at that time.

You've mentioned several of them, the divorce and separation from my wife and family. That came about three weeks after the conclusion of a five-week death penalty trial. Taking those two particular issues first and analyzing them on a scale, perhaps using a DSM-3, or I guess it's DSM-3R now, are those like severe emotional, moderate, fair. How extreme of stress kind of things are those?

A: Well, divorce is a fairly significant stressor. On — there's a Holmes and Ray stress index which lists — I'm not sure how many things. It's about 75, 80 items, and then lists their relative value with an absolute of a hundred and on down. And I believe death of a loved one is probably the highest, and so then down a few from that is divorce. There's all kinds of things on there, work change, moving, you name it.

Obviously doing, defending a murder is not on that index, but having seen other attorneys prepare for murder trials, I understand the toll that it takes on one[']s well-being, in fact to the extent that I can't understand why anybody would want to do it. But that's something else.

The time involved, the amount of work involved, the irregular eating involved, the irregular sleeping involved, and on top of that, someone with a pre-existing mood dis-

order, I would think that those two things together would be at least moderate and most likely severe, particularly with the circumstances that occurred with both.

Q: Okay. If you calculated into that these factors then, and if you would discuss that stress aspect including these factors, the conduct of an aggravated murder trial in August of 1985, the death of a parent in the end of August in 1985, taking on the defense of another aggravated murder case in February of 1986, continuing with an appointed caseload of 35 felonies during the same period of time, and having 12 felonies given to a person in the week immediately after the verdict in the death penalty case, and divorce and separation, and the concomitant financial problems that that creates, how would you analyze the stress situation that a person in that situation would be going through? Without knowing first of all whether that was me or not.

A: I would have to assume that it would be fairly high. I would — well, first of all, if with just those stressors, I think over time eventually a person would have to start falling apart gradually, and then once the depression sets in, or even before the depression sets in, confusion, inability to concentrate, ambivalence, inability to make decisions. Those are very common symptoms of severe depressions.

And so at that point, I don't know how one would function. I don't know how one could do a job. If it was something as simple as stuffing paper in an envelope, they might be able to do that, although, frequently there's psychomotor aggitation [sic] or psychomotor retardation which would impair that ability.

So I guess in view of all of those things, I would have to say I would be surprised, and I am surprised, although I know it happens, that someone wasn't aware that there was a problem, someone else wasn't aware that there was a problem and didn't say something or do something. I find it incredulous that somebody didn't intervene.

Q: Okay. So my final question is, adding those things in, plus the, given what you know with regards to my own previous existing condition as far as the depression is concerned, would that change your analysis of this case at all?

A: No.

Transcript of Proceedings vol. I, at 103-18 (July 12, 1990).

■ A comparison with recent similar cases suggests that Respondent's depression is not an "extraordinary mitigating circumstance" which would affect the presumptive sanction of disbarment.

In *In re Johnson*,[50] the respondent converted $21,051.16 of client trust funds while he suffered from depression and chronic alcoholism. The Disciplinary Board recommended suspension followed by probation. A physician who was board certified in addiction medicine testified that a chronic alcoholic's moral judgment may be affected. The respondent participated in the Lawyers' Assistance Program. However, this court considered alcoholism to be only a mitigating factor, and not an extraordinary mitigating one, and determined that the proper sanction was disbarment.

In *In re McGough*,[51] the respondent converted $18,657.50 of client funds, failed to file criminal appeals and neglected probate matters. The Disciplinary Board recommended suspension followed by probation, but this court determined that the proper sanction was disbarment. A clinical psychologist testified that the respondent was suffering from clinical depression, that the misconduct occurred while he was depressed and that the misconduct continued after the depression began to subside. The respondent did not demonstrate that he did everything necessary to recover, and his depression was not given significant weight as a mitigating factor.

In *In re Rentel*,[52] the respondent misappropriated over $26,000 of client funds while addicted to cocaine and alcohol and while experiencing depression. The Disciplinary Board recommended that the respondent be disbarred, despite the fact that he underwent treatment for his addiction. This court agreed and determined disbarment was the proper sanction. The respondent's addiction was considered a mitigating factor, but not an extraordinary mitigating one.

Respondent Petersen asserts that *Johnson* and *McGough* are distinguishable from his case because in those cases repeated thefts and acts of concealment occurred. In *Johnson*, the multiple invasions of his trust account were docu-

---

[50]114 Wn.2d 737, 790 P.2d 1227 (1990).

[51]115 Wn.2d 1, 793 P.2d 430 (1990).

[52]107 Wn.2d 276, 729 P.2d 615 (1986).

mented each time the respondent wrote a check drawn on that account. Here, because Respondent cashed and used the bulk of the funds from the claims warrant, it was impossible to trace the number of times he invaded his "client trust funds". In both *Johnson* and *McGough*, active acts of conceal-ment occurred. Here, Respondent Petersen did not contact the Bar Association concerning his conversion of funds until 1989, 2 years after he knew that a criminal investigation was under way; he did not promptly respond to the subsequent disciplinary investigations; and he did not advise Glenn Budd that he had not deposited the restitution funds into his trust account nor paid Fred Meyer, Inc., as prosecutor Meyers had requested and reminded him to do.

Cases in which disbarment was determined not to be the appropriate sanction can be distinguished from this case. In *In re Burtch*,[53] the respondent cited depression and emotional and personal problems (bankruptcy and marital separation) as reasons for his lack of diligence, failure to timely file trust account declarations and failure to cooperate with a discipli-nary investigation. The Disciplinary Board recommended a 90-day suspension followed by probation. This court de-creased the sanction to a 45-day suspension followed by pro-bation. The court concluded that respondent's reputation in the legal community and his long years of practice without client complaint justified the leniency of the sanction.

In *In re Kumbera*,[54] the respondent commingled client funds with his own funds and converted trust funds. The Disciplinary Board recommended a 3-year suspension. This court concluded that the respondent's alcoholism and acts of restitution constituted mitigating circumstances and sus-pended him for 1 year.

In *In re Noble*,[55] the respondent misappropriated client funds for which the Disciplinary Board recommended a 3-

---

[53]112 Wn.2d 19, 770 P.2d 174 (1989).

[54]91 Wn.2d 401, 588 P.2d 1167 (1979).

[55]100 Wn.2d 88, 667 P.2d 608 (1983).

month suspension. The court considered the respondent's alcoholism as a mitigating factor and approved the sanction of a suspension.

In *In re Malone*,[56] the respondent misappropriated client funds. The Disciplinary Board recommended a 60-day suspension. However, this court set aside the suspension and placed the respondent on probation. Not following the *ABA Standards*, but relying on the *Noble* factors,[57] this court found that respondent's lack of criminal intent and the lack of harm to any client justified its sanction.

*In re Burtch, supra*, is further distinguishable from this case because the respondent there did not knowingly convert and use client trust funds. *In re Kumbera, supra, In re Noble, supra*, and *In re Malone, supra*, are also further distinguishable from this case because the court's decision was not based on the *ABA Standards*. Recent cases decided under the *ABA Standards* do not consider depression or alcoholism to be extraordinary mitigating factors which warrant variance from the presumptive sanction of disbarment.[58] Although comparison to other cases is difficult because of the specificity of facts involved, the fact that Respondent Petersen knowingly converted the claims warrant places his case within the ambit of *Johnson* and *Rentel*. In both cases, the respondents converted client funds, claimed depression and substance abuse as mitigating factors, had expert testimony to support their claims, and entered rehabilitation programs. In both cases the court focused on the respondents' knowledge of their wrongdoing at the time the conversions occurred. Both respondents were disbarred.

Respondent Petersen relies on the testimony of Richard S. Keyser, a licensed nurse practitioner specializing in mental

---

[56]107 Wn.2d 263, 728 P.2d 1029 (1986).

[57]*In re Noble*, 100 Wn.2d 88, 667 P.2d 608 (1983).

[58]*See In re Johnson*, 114 Wn.2d 737, 790 P.2d 1227 (1990); *In re McGough*, 115 Wn.2d 1, 793 P.2d 430 (1990); *In re Rentel*, 107 Wn.2d 276, 729 P.2d 615 (1986). These cases also do not give substantial weight to a respondent's remorse or acts of cooperation or restitution.

health psychopharmacology, to medically substantiate his claim of depression. Strong professional evidence usually is required to substantiate claims of depression or substance abuse: *In re Johnson, supra* (a physician, board certified in addiction medicine); *In re McGough, supra,* and *In re Hankin*[59] (clinical psychologists with the Lawyers' Assistance Program); *In re Rentel, supra* (a psychiatrist). The Disciplinary Board noted that there was not strong medical evidence to substantiate Respondent's claim.[60] Both Respondent's testimony and Mr. Keyser's testimony support the hearing officer's conclusion that Respondent Petersen knowingly converted and used client trust funds.[61] Even giving full weight to Mr. Keyser's testimony concerning Respondent's depression, under *Johnson* and *Rentel* it would not be considered an extraordinary mitigating circumstance to justify departure from the presumptive sanction of disbarment.

Disciplinary proceedings where a respondent attorney pleads "physical or mental disability or impairment"[62] as a mitigating factor should be supported by credible expert evidence. The Rules for Lawyer Discipline provide for the use of experts on petitions for reinstatement from disability to active status. RLD 10.3(b) states:

> The petition for reinstatement shall set forth the facts demonstrating that the disability has been removed. . . . Upon the filing of the petition the chairperson of the Board shall direct whatever action appears necessary or proper to determine whether the disability has been removed. Such actions include . . . (2) *that an examination of the lawyer be conducted by a qualified expert or experts . . . .*

---

[59] 116 Wn.2d 293, 804 P.2d 30 (1991).

[60] Transcript of Disciplinary Board Proceedings, at 30, 47.

[61] Compare *In re McGough,* 115 Wn.2d 1, 793 P.2d 430 (1990) (disbarment for conversion of trust funds even though the hearing officer did not make a finding as to respondent McGough's mental state).

[62] *ABA Standard* 9.32(h).

Experts have been used in recent disciplinary cases: *In re Hankin*[63] (a clinical psychologist with the Lawyers' Assistance Program); *In re Johnson*[64] (a physician board certified in addiction medicine); *In re McGough*[65] (a clinical psychologist with the Lawyers' Assistance Program); and *In re Rentel*[66] (a psychiatrist). Experts must meet the requirements of Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Admissibility of expert testimony under ER 702 requires that the witness qualify as an expert, that the opinion be based on an explanatory theory generally accepted in the scientific community and that the testimony would be helpful to the trier of fact.[67]

Expert testimony is generally required when an essential element in the case is best established by an opinion which is beyond the expertise of a layperson.[68] "Medical facts in particular must be proven by expert testimony unless they are 'observable by [a layperson's] senses and describable without medical training.' "[69] In an industrial insurance case, this court stated that "medical testimony is required to establish disability . . . [t]his comports with the recognition that diagnosis and prognosis are medical matters which

---

[63]116 Wn.2d 293, 804 P.2d 30 (1991).

[64]114 Wn.2d 737, 790 P.2d 1227 (1990).

[65]115 Wn.2d 1, 793 P.2d 430 (1990).

[66]107 Wn.2d 276, 729 P.2d 615 (1986).

[67]*State v. Ciskie,* 110 Wn.2d 263, 271, 751 P.2d 1165 (1988).

[68]*Harris v. Groth,* 99 Wn.2d 438, 449, 663 P.2d 113 (1983); *Young v. Key Pharmaceuticals, Inc.,* 112 Wn.2d 216, 770 P.2d 182 (1989).

[69](Citation omitted.) *Harris,* at 449.

require medical testimony and cannot be evaluated by the observation of lay witnesses."[70] Expert testimony regarding depression has been used in both civil and criminal cases.[71]

Depression is included as a mood disorder under the American Psychiatric Association's reference, *The Diagnostic and Statistical Manual of Mental Disorders* (DSM-III).[72] The diagnostic criteria for a major depressive episode involves the determination that five out of nine symptoms[73] are present for a 2-week period, that the symptoms represent a change from previous functioning and that one of the symptoms is either depressed mood or loss of interest or pleasure in daily activities. Once a determination of the symptoms is made, the diagnostic criteria require a negative finding that the episode was initiated by an organic factor, was a normal reaction to the death of a loved one, was accompanied by delusions or hallucinations, or was superimposed on schizophrenia, delusional disorder, or psychotic disorder which is not otherwise specified. Following this negative finding, the severity of the depression is determined.

---

[70]*Ravsten v. Department of Labor & Indus.*, 108 Wn.2d 143, 153, 736 P.2d 265 (1987).

[71]In *Kirk v. WSU*, 109 Wn.2d 448, 746 P.2d 285 (1987), calculations of damages were based on information from a clinical psychologist regarding plaintiff's depression. In *State v. Allert*, 117 Wn.2d 156, 815 P.2d 752 (1991), testimony of a psychiatrist was used in a sentencing proceeding to establish the defendant's depression, compulsive personality and alcohol addiction.

[72]American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (3d rev. ed. 1987).

[73]DSM-III. The symptoms are (1) depressed mood most of the day, nearly every day, (2) markedly diminished interest or pleasure in all, or almost all, activities most of the day, nearly every day, (3) significant weight loss or weight gain when not dieting, or decrease or increase in appetite nearly every day, (4) insomnia or hypersomnia nearly every day, (5) psychomotor agitation or retardation nearly every day, (6) fatigue or loss of energy nearly every day, (7) feelings of worthlessness or excessive or inappropriate guilt nearly every day, (8) diminished ability to think or concentrate, or indecisiveness, nearly every day, and (9) recurrent thoughts of death, recurrent suicidal ideation without a specific plan, or a suicide attempt or a specific plan for committing suicide. DSM-III, at 218-24.

The diagnosis of depression is not a simple process of encyclopedic reference. Although some symptoms may be observable by lay witnesses, the entire diagnostic process involves medical matters which cannot be evaluated by the observation of lay witnesses. Expert testimony must therefore be used to determine whether a respondent attorney in a disciplinary proceeding had a mental disability if the attorney claims mental disability as a mitigating circumstance. Richard S. Keyser qualifies as an expert under ER 702 for his testimony in this case.

■ The recommendation of the Disciplinary Board will usually be adopted by this court unless, based on one or more of the following "*Noble*" factors,[74] the court is clearly persuaded that the sanction recommended by the Disciplinary Board is inappropriate:

> (1) The purposes of attorney discipline (sanction must protect the public and deter other attorneys from similar misconduct);
> (2) The proportionality of the sanction to the misconduct (sanction must not depart significantly from sanctions imposed in similar cases);
> (3) The effect of the sanction on the attorney (sanction must not be clearly excessive);
> (4) The record developed by the hearing panel (sanction must be fairly supported by the record and must not be based upon considerations not supported by the record); and
> (5) The extent of the agreement among the members of the board (sanction supported by unanimous recommendation will not be rejected in the absence of clear reasons).[75]

Respondent Petersen argues that the sanctions recommended by the Disciplinary Board should not be disturbed because they are sufficient to maintain the purposes of lawyer discipline and are proportional to other similar cases. This latter contention is not supported by *Johnson, McGough,* and *Rentel.*

The purposes of attorney discipline are protection of the public, deterrence of other attorneys from similar conduct,

---

[74]*See In re Noble,* 100 Wn.2d 88, 667 P.2d 608 (1983).

[75]*In re Hankin,* 116 Wn.2d 293, 296, 804 P.2d 30 (1991).

and preservation of confidence in the legal system.[76] Respondent Petersen claims that the public is protected because he will not be able to practice law "in the immediate future" and that he must complete a period of probation after his suspension. In *In re Noble, supra,*[77] a pre-*ABA Standards* case, this court found that an attorney held in high esteem by his peers did not pose a future threat to clients where he had no disciplinary problems prior to his problem with alcoholism, but committed violations prior to his successful treatment for alcoholism. Respondent Petersen's work as a trial lawyer has been praised, but he has had a pattern of client complaints since 1985, 2 years prior to the claimed onset of his depression. Considering his procrastination and ambivalence in making restitution, his occasional noncompliance with his diversion agreement, and the hearing officer's finding that he is unfit to practice law,[78] there is a strong and reasonable probability that he would be a continuing threat to future clients.

Respondent Petersen's conversion of the claims warrant violated Rule of Professional Conduct 8.4(b), (c) and (d). He violated practice norms and conduct directly relevant to the practice of law. He did not notify the Bar Association until a felony charge against him was imminent. Since "violations of the law by lawyers contribute to the erosion of respect for legal institutions and the law",[79] imposing the presumptive sanction of disbarment would preserve public confidence in the legal system, as well as act as a deterrent to other attorneys from similar conduct. These factors support departure from the Disciplinary Board's recommendation and

---

[76]*In re McGough,* 115 Wn.2d 1, 8, 793 P.2d 430 (1990); *In re Hankin,* 116 Wn.2d 293, 298, 804 P.2d 30 (1991); *In re Curran,* 115 Wn.2d 747, 762, 801 P.2d 962 (1990).

[77]100 Wn.2d 88, 667 P.2d 608 (1983).

[78]Conclusions of law, at 97.

[79]*In re Curran,* at 762.

imposition of the sanction of disbarment, the usual sanction for conversion of client funds.

Disciplinary Board member C. C. Bridgewater, in his dissenting opinion to the Board's recommendation of suspension and probation for Respondent Petersen, suggested that *ABA Standard* 6.21 would provide another basis for disbarment because Respondent had used moneys "payable by court order to the vendors." *ABA Standard* 6.21 states:

> Disbarment is generally appropriate when a lawyer knowingly violates a court order or rule with the intent to obtain a benefit for the lawyer or another, and causes serious injury or potentially serious injury to a party or causes serious or potentially serious interference with a legal proceeding.

Respondent Petersen obtained an order from the Clark County Superior Court authorizing payment to the defense vendors in the *Dykgraaf* case. The Clark County Treasurer issued a check to him pursuant to the order. Respondent deposited a portion of the proceeds from the check in his general account and took the remainder of the check in cash with full knowledge that it was in violation of the court order authorizing payment.

While *ABA Standard* 6.21 might reinforce the sanction of disbarment, our conclusion instead relies upon *ABA Standards* 4.11 and 5.11. Under the facts determined in this case, the presumptive sanction under *ABA Standards* 4.11 and 5.11 is disbarment, after weighing relevant aggravating and mitigating factors.

CONCLUSION

We conclude that Richard A. Petersen should be disbarred for his conversion of the Clark County claims warrant in the amount of $6,827.25. The other violations (Glenn Budd restitution, Steiger appeal and false declarations of compliance) would not merit the sanction of disbarment, but they are merged into the more serious sanction of disbarment.

DORE, C.J., and BRACHTENBACH, ANDERSEN, DURHAM, and GUY, JJ., concur.

UTTER, J. (dissenting) — I dissent because the record in this case is insufficiently developed on the question of Petersen's mental state at the time of the acts with which he is charged to justify disbarment. To justify this most severe sanction we should be persuaded Petersen was essentially responsible for his misdeeds. On the record before us, that conclusion cannot be definitively ascertained.

The majority correctly indicates that disbarment is the presumptive sanction for conversion of client funds. Majority, at 854 (citing American Bar Ass'n, *Standards for Imposing Lawyer Sanctions*, Stds. 4.11, 5.11 (1986)). Although that is true, it is important to remember the *ABA Standards* do not purport to recommend the type of discipline to be imposed in any particular case. Indeed, the *ABA Standards* emphasize the discipline imposed "must reflect the circumstances of each individual lawyer, and therefore provide for consideration of aggravating and mitigating circumstances in each case." *ABA Standards*, Std. 1.3 Commentary, at 19.

The majority correctly notes the *ABA Standards* provide that behavior normally justifying disbarment may receive a lesser sanction if mitigating circumstances are present. Of the mitigating factors listed in the *ABA Standards*, the majority identifies the most relevant as Standard 9.32(c) personal or emotional problems and (h) physical or mental disability or impairment. I agree. The question then becomes, as the majority indicates, whether respondent's depression is an "extraordinary mitigating circumstance" warranting disbarment. Majority, at 856-57. It is here that I diverge from the majority's otherwise sound analysis.

The majority properly adheres to the analytical framework provided by the ABA, according to which the following factors are evaluated to determine the appropriate sanction: (1) the ethical duty breached; (2) the mental state of the actor; and (3) the extent of the injury. *See ABA Standards*, at 5. My reservation with the majority's disposition of this case is that the record points in different directions with respect

to Petersen's mental state at the time he committed the acts charged. On the one hand, the record includes findings by the hearing examiner that the conversion of funds was "knowing". See majority, at 847, 847-50. On the other, the record contains findings that it was Petersen's serious depression that permitted the misdeeds to occur: "Respondent Petersen's misconduct occurred in 1987 and early 1988 *as the result* of a major depression." (Italics mine.) Hearing Officer's Letter Opinion, at 5; "Richard Petersen suffered a major depression during which he committed all of the acts for which he is now subject to discipline." Hearing Officer's Letter Opinion, at 7; see also majority, at 847-48 (quoting finding of fact 81).

The transcript of the proceedings before the hearing examiner included the following testimony about Petersen's depression from the licensed nurse practitioner in psychiatry and mental health who treated him:

> Initially it was environmental, the things that were mentioned previously: the death of his father, inability to resolve the grief over that, the divorce, the heavy work load, just the emotional content of dealing with the people he was dealing with, the long hours, the poor eating, the poor sleeping. He stopped exercising. That's what started it.
> But at some point, his brain accommodated him by going haywire and *it became biologically mediated*, and at that point changing his environment completely most likely would not have gotten rid of the depression. . . .

(Italics mine.) Transcript of Proceedings vol. I, at 124-25.

At the very least then there is ambivalence in the record regarding Petersen's mental state at the time of the relevant acts. Nevertheless, the majority concludes "[a] comparison with recent similar cases suggests that Respondent's depression is not an 'extraordinary mitigating circumstance' which would affect the presumptive sanction of disbarment." Majority, at 864.

The majority relies principally on two cases for this holding, *In re Rentel*, 107 Wn.2d 276, 729 P.2d 615 (1986) and *In re Johnson*, 114 Wn.2d 737, 790 P.2d 1227 (1990). The majority explains:

[T]he fact that Respondent Petersen knowingly converted the claims warrant places his case within the ambit of *Johnson* and *Rentel*. In both cases, the respondents converted client funds, claimed depression and substance abuse as mitigating factors, had expert testimony to support their claims, and entered rehabilitation programs. In both cases the court focused on the respondents' knowledge of their wrongdoing at the time the conversions occurred. Both respondents were disbarred.

Majority, at 867. In my view the test we set forth in *Rentel* and *Johnson*, and on which the majority relies, is insufficiently precise to permit a fair disposition of this case on the record before us. In those cases we asked whether the acts were committed "knowingly". The record here reveals the difficulty inherent in our present application of the "knowing" standard.

As discussed earlier, the hearing examiner expressed two potentially incompatible conclusions: (1) Petersen's misappropriation of funds was *knowing*; and (2) the conduct was the product of his depressed mental state. Hearing Officer's Letter Opinion, at 5, 7. Indeed, there is uncontroverted expert testimony in the record that Petersen was considering suicide at the time of the relevant acts, and that he is unlikely to engage in such acts again because he has learned to manage his mental health. The majority cites this portion of the record:

*[H]e had no idea that it was all depression or* that it was a significant, a *severe depression* going on at that time.

*He knew his mood was down, but thought that it was due to situational factors. And yet with his history and the severity of the symptoms, it was obvious that he was suffering from a major depression.*

. . . .

*. . . My understanding of the incident of misappropriation of funds and his mental status at the time lead me to believe in fact that he was suffering from a serious depression to the point that he was actively suicidal at times. There were days when he would contemplate dying and would plan his death.* And then there would be days where that would remit.

The stress that he was going through at the time, of having done, I believe, three murder trials, two of them — I may be wrong on this, but it seems to me that a couple of them were aggravated, one of them involved the death penalty, also han-

dling a fairly heavy felony load at the time, going through a divorce, and having severe financial difficulties, that with his mental status, I believe, made it much easier to do what he did.

I don't see it as a matter of intentionally — and, again, I don't mean to argue semantics or legal terms here. I'm not a lawyer. But I don't see it as being in the same kind of willful act as somebody walking into a convenien[ce] store with a gun and robbing it.

I see it more as the act of a desparate [*sic*] man, a man whose world was literally falling apart, . . .

. . . .

So at this point, *assuming that he doesn't get into that kind of depression again with those kinds of stressors, I believe that the chance of something like this happening are [*sic*] insignificant.* Whether or not he can prevent that, I believe he can. Can I say that beyond a reasonable doubt he'll do that? I don't know. I mean, I can't say that for anybody.

But *I believe at this point he has an adequate understanding of his condition* and what he needs to do to take care of himself. He's demonstrated a willingness and a capacity to do that. I don't see it as being a problem.

(Italics mine.) Majority, at 859-61 (quoting Transcript of Proceedings vol. I, at 109-12 (July 12, 1990)). If Petersen's misconduct was the consequence of a state of clinical depression — a question at least possible on this record — it seems both unfair and gratuitous to disbar Petersen, both because his acts are less culpable if the product of illness, and because the public would not be vulnerable to similar acts in the future if he obtains effective treatment and maintains sound mental health. *See In re Noble*, 100 Wn.2d 88, 96, 667 P.2d 608 (1983) (the primary purpose of sanctions is not punishment (although they may have a punitive effect, *see, e.g., In re Rentel*, 107 Wn.2d at 282); their primary purpose is to protect the public, deter misconduct, and protect public confidence in our bar). *See In re McLendon*, 120 Wn.2d 761, 774, 845 P.2d 1006 (1993) (citing *In re Noble*, 100 Wn.2d at 95).

To the extent our previous cases suggest the severity of the sanction for conversion of client funds should turn solely on whether the conduct at issue was "knowing", I believe the inquiry should be further refined. The mere fact that

Petersen was aware of his conduct should be insufficient to justify disbarment. Instead, we should ask whether the conduct, even if knowing, was the product of mental illness over which the respondent had no meaningful control, and for which he can be treated. Only if the answer is yes should the most severe of sanctions, disbarment, be imposed.

This court tacitly expressed a similar concern in the recent case of *In re McLendon, supra,* in which we overturned the Disciplinary Board's decision to disbar for conversion of funds because we considered the acts at issue to be the product of mental illness. The board concluded McLendon acted knowingly in converting the funds. The *ABA Standards* state that to act with "knowledge" one must have "the conscious awareness of the nature or attendant circumstances of the conduct . . .". American Bar Ass'n, *Standards for Imposing Lawyer Sanctions* 17 (1986), *cited in McLendon,* at 770; *see also Standards for Imposing Lawyer Sanctions,* Stds. 4.11, 4.12. The expert testimony indicated McLendon's judgment was severely impaired by the "biochemical, physiologic" nature of his disorder. *McLendon,* at 770. We overturned the board's finding as to McLendon's knowing mental state, relying in part on the following uncontroverted testimony from his doctor:

> Q: My original question, I am trying to figure out if we have a person suffering from a bipolar disorder that would be in a manic stage, how would that affect their mental state, *their ability to form an intent or the ability to know that they acted and be aware of the consequences?*
> A: *It would be severely impaired.*
> Q: *Would the same hold true for depression?*
> A: *Yes.*

(Italics added in *McLendon.*) *McLendon,* at 765-66 (citing Transcript of Proceedings, at 151).

We explained that we departed from the Disciplinary Board's recommendation because it treated the respondent "exactly as if he never suffered from bipolar disorder" and because we were "fairly persuaded the sanction of disbar-

ment is not fairly supported by the record." *McLendon*, at 774 (citing *Noble*, at 96).

In effect in *McLendon*, we declined to accept the board's characterization of the conduct as "knowing" because the uncontroverted medical testimony indicated that the respondent's judgment was so impaired that it would be unfair to hold him accountable for his wrongdoing. *See McLendon*, at 772 ("The record reflects that, while McLendon could act or function, his mental state and his judgment as to his actions, in all aspects of his life, were beyond his control in both phases of the illness"). The record in the instant case does not permit a conclusion one way or the other as to whether Petersen's behavior was knowing in the sense that it would be both sensible and fair to hold him accountable for his actions. I would therefore remand to the hearing examiner for further findings regarding the nature of Petersen's mental state during the period in question, specifically whether he was suffering from a state of clinical depression, and if so, how it affected his judgment. I would then have the hearing examiner — who has had the opportunity to observe the demeanor of Petersen and the other witnesses and is thus in a better position to fashion a sentence — modify the sentence accordingly.

DOLLIVER and JOHNSON, JJ., concur with UTTER, J.