[No. 61935-2. En Banc. December 14, 1995.]

WILLIAM FOSTER REESE, ET AL., *Respondents*, v. JAMES E. STROH, JR., M.D., ET AL., *Petitioners*.

*Williams, Kastner & Gibbs,* by *Mary H. Spillane,* for petitioners.

*Richards & Kinerk, Inc., P.S.,* by *Dwayne A. Richards;* and *Maltman, Reed, North, Ahrens & Malnati, P.S.,* by *Douglass A. North,* for respondents.

*Malcolm L. Edwards; Bryan P. Harnetiaux* and *Gary N. Bloom* on behalf of Washington State Trial Lawyers Association; *Russell C. Love;* and *Linda B. Clapham,* amici curiae.

MADSEN, J. — William and Frances Reese brought this medical malpractice action against Dr. James E. Stroh, Jr., alleging that he negligently failed to treat Mr. Reese's emphysema with a protein replacement therapy called Prolastin. The trial court excluded the Reeses' expert medical witness' opinion testimony regarding causation as lacking sufficient foundation to go to the jury. The Court of Appeals reversed, holding such testimony should be evaluated under the test set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). We affirm that reversal, though under an analysis considerably different from that of the Court of Appeals.

## FACTS

In 1984, William Reese, hereafter referred to as the Plaintiff, began seeing Dr. Stephen Aprill for treatment of asthma. One year later, Dr. Aprill referred the Plaintiff to Dr. Stroh because he believed that Plaintiff's condition involved more than asthma. Dr. Stroh, hereafter referred to as the Defendant, is board certified in internal medicine and allergy and immunology. In spring 1985, the Defendant diagnosed the Plaintiff as having asthma, chronic obstruction pulmonary disease, and alpha-1-antitrypsin deficiency (AAT deficiency). AAT deficiency is a rare genetic disease characterized by low serum levels of AAT, a blood-borne protein which inhibits the destructive action of certain enzymes in the lung. In some patients with AAT deficiency, those uninhibited enzymes can destroy lung tissue, causing emphysema.

When the Defendant diagnosed the Plaintiff with AAT deficiency in 1985, AAT therapy, marketed under the name Prolastin, was not available. The Defendant prescribed bronchodilator medications, steroids, and antibiotics, and urged the Plaintiff to stop smoking and to avoid allergens and environmental irritants. The Defendant told the Plaintiff that his condition was not serious and that

he could expect to lose lung capacity at a rate approximately one percent per year faster than the average person. Unfortunately, the Plaintiff lost lung capacity more rapidly than the Defendant predicted.

In November 1989, the Plaintiff learned that his brother also had been diagnosed with AAT deficiency and was to begin Prolastin therapy, which had been approved by the Food and Drug Administration (FDA) in 1987. Prolastin therapy consists of administering Prolastin (a preparation of purified human AAT) intravenously at regular intervals to maintain AAT levels in the blood above the AAT deficiency threshold. Prolastin therapy has proven valuable in treating other serum protein deficiencies such as hemophilia. The FDA approved Prolastin for treatment of AAT-deficient patients based on the knowledge that Prolastin raises the level of antitrypsin in the blood, but without statistical proof of its efficacy.[1] Plaintiff and his wife called the Defendant to inquire about Prolastin therapy. The Defendant declined to prescribe Prolastin because he regarded it as an expensive therapy of unproven benefit, and because he thought Prolastin therapy posed possible risks for transmission of blood-borne infections. In March 1990, the Plaintiff began Prolastin therapy with his brother's doctor.

In October 1990, Plaintiff and his wife filed this action against the Defendant, alleging that his failure to prescribe Prolastin resulted in a preventable worsening of Plaintiff's lung function. More specifically, Plaintiff contended that the Defendant should have treated him with Prolastin between 1987, when Prolastin was approved by the FDA, and 1989, when Plaintiff's lung capacity fell below the critical range for treatment. The Defendant subsequently filed a motion in limine to exclude the

---

[1]The FDA determined that proving the efficacy of Prolastin in treating emphysema would require a population study involving 600 people, would take three to five years to complete, and would be very expensive. Because of the difficulties posed by such a study, the FDA decided to release the drug for AAT-deficient patients because of studies concluding that Prolastin corrected AAT deficiency in the bloodstream.

testimony of the Plaintiff's experts on causation. The basis of the motion was that the "[P]laintiff's experts lack the foundation to state with reasonable medical certainty that the 18 month delay in Prolastin treatment caused [the Defendant's] current pulmonary condition . . . ." Clerk's Papers at 70. The trial court reserved ruling on the motion until trial.

The Plaintiff's first expert witness was Dr. Robert J. Fallat, chief of the pulmonary division at California Pacific Medical Center in San Francisco. Dr. Fallat is board qualified in internal and pulmonary medicine and has done research on AAT deficiency since 1966. After examining him as to his qualifications and the nature of AAT deficiency, as well as his knowledge about and experience with Prolastin therapy, the Plaintiff sought to elicit testimony as to whether Dr. Fallat had "an opinion with a reasonable medical probability basis as to whether or not Prolastin is an effective treatment for Alpha-1 Antitrypsin Deficiency patient such as Mr. Reese." Verbatim Report of Proceedings (VRP) at 70 (June 18, 1992). After sustaining a foundation objection to the opinion, the trial court allowed the Plaintiff to continue Dr. Fallat's testimony outside the presence of the jury as an offer of proof.

On the basis of the information and studies supporting the FDA's approval of Prolastin, his own clinical experience, and information regarding the Plaintiff's medical condition, Dr. Fallat concluded that, based upon reasonable medical probability, Prolastin therapy would be effective for the Plaintiff. Dr. Fallat also concluded that there "wouldn't be a handful of pulmonologists in the country" who, given the Plaintiff's circumstances, would not prescribe Prolastin therapy, and that by failing to prescribe Prolastin, the Defendant had not acted as a reasonably prudent physician. VRP at 103 (June 18, 1992). Dr. Fallat also defended the FDA's decision to approve the drug without statistical proof that it was effective in halting the progression of lung disease.

After hearing the offer of proof, the trial court held that Dr. Fallat's opinion would be inadmissible because it found that Dr. Fallat did not have a statistically significant basis for his opinion as to the efficacy of Prolastin therapy in treating the Plaintiff's malady. Although the trial court did not state it was applying the admissibility test set forth in *Frye v. United States*, 293 F. 1013, 34 A.L.R. 145 (D.C. Cir. 1923), its explanation for rejecting Dr. Fallat's testimony indicates it found Prolastin therapy not to be generally accepted within the relevant scientific community. *See Frye*, 293 F. at 1014.

In light of the court's ruling, the Plaintiff decided not to call his other expert witnesses, whose testimony would have been to the same effect. The Defendant then moved for a directed verdict, which the trial court granted on the basis that "[Plaintiff] could not prove proximate cause." Clerk's Papers at 874. The Plaintiff's motion for reconsideration was denied, and he appealed the trial court's evidentiary ruling.

Division One of the Court of Appeals reversed the trial court, holding that the *Frye* test does not apply to expert testimony in civil cases, and that even if it did, Dr. Fallat's testimony was admissible because the methods he used to reach his conclusion were generally accepted in the scientific community. *Reese v. Stroh*, 74 Wn. App. 550, 555-56, 874 P.2d 200 (1994). In rejecting the *Frye* test, the Court of Appeals expressly adopted the approach taken in *Daubert*, 113 S. Ct. at 2786. Finding Dr. Fallat's testimony admissible under the *Daubert* standard, the Court of Appeals reversed the directed verdict and remanded for trial. *Reese*, 74 Wn. App. at 566. We affirm the reversal and remand but reject the Court of Appeals' reliance on *Daubert* as unnecessary.

### ANALYSIS

The admissibility of expert testimony in Washington is governed by ER 702, which provides as follows:

> If scientific, technical, or other specialized knowledge will

assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

As reflected in recent Washington cases, the rule involves a two-step inquiry—whether the witness qualifies as an expert and whether the expert testimony would be helpful to the trier of fact. *State v. Russell*, 125 Wn.2d 24, 69, 882 P.2d 747 (1994), *cert. denied*, 115 S. Ct. 2004 (1995); *State v. Kalakosky*, 121 Wn.2d 525, 541, 852 P.2d 1064 (1993); *State v. Cauthron*, 120 Wn.2d 879, 890, 846 P.2d 502 (1993); *see also* 5A Karl B. Tegland, Washington Practice, *Evidence* § 288, at 380 (3d ed. 1989). The bases of an expert's opinion are set forth in ER 703:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

When the admissibility of *novel* scientific evidence is at issue, Washington courts initially turn to the general acceptance test derived from *Frye*. The general acceptance standard serves as a shorthand method for judges in deciding whether novel scientific evidence, or evidence which is in the "twilight zone" between the "experimental and demonstrable stages," has a valid scientific basis. *See Cauthron*, 120 Wn.2d at 887 (citing *Frye*, 293 F. at 1014). Once novel scientific evidence has been deemed admissible under *Frye*, the trial court must analyze whether that testimony is proper expert testimony under ER 702. *Cauthron*, 120 Wn.2d at 889-90.

In the recent *Daubert* decision, the United States Supreme Court rejected the *Frye* general acceptance standard for determining the admissibility of scientific evidence. The Court held that the Federal Rules of Evidence supersede *Frye* and that the text of Fed. R. Evid. 702

contains no "general acceptance" prerequisite. *Daubert*, 113 S. Ct. at 2794. The Supreme Court observed, however, that even for admission under the Rules of Evidence, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 113 S. Ct. at 2795. The Court then announced a new standard for admitting both novel and well-accepted scientific evidence: the evidence must pertain to "scientific knowledge" defined as falsifiable scientific theory, capable of empirical testing. *Daubert*, 113 S. Ct. at 2795-97. Under *Daubert*, it is the trial judge's task to decide "whether the reasoning or methodology underlying the testimony is scientifically valid . . . ." *Daubert*, 113 S. Ct. at 2796.[2]

The Court of Appeals need not have decided whether to substitute *Daubert* for *Frye* in civil cases because the Defendant here did not argue that the theory or the methodology involved in Prolastin therapy lacks acceptance in the scientific community. Indeed, Dr. Fallat's uncontroverted testimony was that the FDA approved the use of Prolastin in treating AAT-deficient patients. Rather, the Defendant objected to Dr. Fallat's expert causation opinion on the basis that there have been no statistically significant studies proving the efficacy of Prolastin therapy when used to treat AAT deficiency.

An expert opinion regarding application of an accepted theory or methodology to a particular medical condition does not implicate *Frye*. *See State v. Ortiz*, 119 Wn.2d 294, 831 P.2d 1060 (1992) (*Frye* inapplicable where testimony based not on novel scientific procedures but on practical experience and acquired knowledge). Admissibility of a causation opinion under these circumstances is weighed

---

[2]The Supreme Court rejected the *Frye* test because Fed. R. Evid. 702 does not expressly contain a general acceptance requirement. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 2794, 125 L. Ed. 2d 469, 480 (1993). It is interesting to note, however, that the rule is also bereft of any language regarding "falsifiability" or capable of "empirical testing." *Daubert*, 113 S. Ct. at 2797. We also note that even *Daubert* applies general acceptance as a factor to consider in evaluating reliability.

under the general reliability standards of ER 702 and ER 703. While we acknowledge the invitation to adopt the federal test for reliability under Fed. R. Evid. 702 as outlined in *Daubert*, we decline to do so in this case and find that the issues here are fully resolvable under this state's evidence rules and the cases interpreting them.

Expert testimony is usually admitted under ER 702 if helpful to the jury's understanding of a matter outside the competence of an ordinary layperson. *See State v. Ciskie*, 110 Wn.2d 263, 279, 751 P.2d 1165 (1988); *Riggins v. Bechtel Power Corp.*, 44 Wn. App. 244, 254, 722 P.2d 819, *review denied*, 107 Wn.2d 1003 (1986). Medical malpractice cases are a prime example of cases where such testimony is needed. 5A Karl B. Tegland, Washington Practice, *Evidence* § 300, at 435 (3d ed. 1989).

Indeed, the general rule in Washington is that expert medical testimony on the issue of proximate cause is required in medical malpractice cases. *McLaughlin v. Cooke*, 112 Wn.2d 829, 837, 774 P.2d 1171 (1989); *O'Donoghue v. Riggs*, 73 Wn.2d 814, 824, 440 P.2d 823 (1968). As one commentator explains,

> The requirement of expert testimony to prove causation is a sound and logical rule. . . . [J]urors and courts generally do not possess sufficient knowledge and training to determine whether a physician's or surgeon's actions actually caused plaintiff's injury. The medical field is foreign to common experience. The expert medical witness domesticates this field for the trier of fact, and counsel must be aware of this situation to best serve his client . . . .

Robert J. Rudock, Comment, *Medical Malpractice—The Necessity of Expert Testimony and the Use of a General Physician as an Expert Witness in a Malpractice Action Against a Specialist*, 10 Ohio N.U. L. Rev. 37, 47-48 (1983).

Here, Dr. Fallat's status as an expert is not in dispute. Nor should it be disputed that his testimony would prove helpful to the trier of fact. Few lay persons are well versed in either Prolastin therapy or its use in combatting AAT

deficiency. In so observing, however, it is equally important to observe that Dr. Fallat's testimony is not likely to overwhelm the jury or prove so technical that the jury is unable to judge its reliability.

The reliance test of ER 703 differs somewhat from the helpfulness test of ER 702. *See* 5A Tegland § 296, at 138 (Supp. 1995). ER 703 relates to the factual basis for the expert's opinion and the rule permits an opinion based on the expert's first-hand knowledge or on information generally relied on in the field of expertise. While an expert may express an opinion based on statistics, such a basis is certainly not required. *See* 5A Tegland § 306, at 455.

We do not find that lack of statistical support fatal to Dr. Fallat's causation opinion. Such support is required neither by ER 702, ER 703, nor by our case law. Rather, medical expert testimony must be based upon a "reasonable degree of medical certainty." *McLaughlin*, 112 Wn.2d at 836 (citing *State v. Crenshaw*, 98 Wn.2d 789, 802 n.2, 659 P.2d 488 (1983)); *see also* 5A Tegland § 291, at 396. Evidence establishing proximate cause in medical malpractice cases must rise above speculation, conjecture, or mere possibility. *See McLaughlin*, 112 Wn.2d at 837; *see also Coffman v. McFadden*, 68 Wn.2d 954, 961, 416 P.2d 99 (1966).

We agree with the Court of Appeals that Dr. Fallat's proposed testimony, based on the information known to the medical profession at the time of Plaintiff's treatment, "is the type of information jurors and their physicians rely on in their everyday lives to make decisions about health care. There is nothing mystical about it, and jurors are perfectly capable of determining what weight to give this kind of expert testimony." *Reese*, 74 Wn. App. at 565. A jury can certainly evaluate the foundation for Dr. Fallat's opinion that the failure to prescribe Prolastin therapy caused a preventable worsening of the Plaintiff's condition. Furthermore, the jury can evaluate the Defendant's reasons for failing to apply Prolastin as well as the lack of substantial statistical support concerning the therapy's efficacy.

We conclude here that Dr. Fallat was prepared to offer an opinion on causation with a reasonable degree of medical certainty, based on his extensive experience in treating AAT deficiency and his participation in and reliance on studies using Prolastin therapy. This is in conformity with the rules of evidence and our cases.

■ In general, the admission or refusal of evidence lies within the sound discretion of the trial court. *Cauthron*, 120 Wn.2d at 890; *Oliver v. Pacific Northwest Bell*, 106 Wn.2d 675, 684, 724 P.2d 1003 (1986). The trial court abused its discretion by applying the wrong legal standard to the evidence. *See Fraser v. Beutel*, 56 Wn. App. 725, 734, 785 P.2d 470 (discretion abused where reason for exclusion of evidence contrary to law), *review denied*, 114 Wn.2d 1025 (1990). We reverse and remand this case for a reassessment of the proposed testimony in conformity with this opinion.

DURHAM, C.J., DOLLIVER and GUY, JJ., and ANDERSEN and BRACHTENBACH, JJ. Pro Tem., concur.

JOHNSON, J. (concurring) — The majority reaches the correct result in this case but its approach is of no precedential value and offers no help to parties and courts faced with similar problems. The majority fails to analyze and apply ER 702 in any meaningful manner. I write separately to provide a constructive framework for applying ER 702 in cases involving the admissibility of expert testimony based on scientific evidence, and I would adopt the analytical framework used by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and relied upon by the Court of Appeals. *Reese v. Stroh*, 74 Wn. App. 550, 874 P.2d 200 (1994). In order to reach ER 702, I must first express my disagreement with

the majority's interpretation of our state's *Frye*[3] jurisprudence.

## WASHINGTON AND THE *Frye* STANDARD

In a recent criminal case considering the admissibility of DNA evidence, this court explained the relationship between the *Frye* general acceptance standard and ER 702. *State v. Cauthron*, 120 Wn.2d 879, 887, 846 P.2d 502 (1993). We held that when novel scientific evidence is at issue, courts apply *Frye*'s general acceptance standard as an initial inquiry in determining admissibility. *Cauthron*, 120 Wn.2d at 887. Once the proposed scientific evidence is deemed to be generally accepted, then the court addresses the requirements of ER 702. *Cauthron*, 120 Wn.2d at 887.

In *criminal* cases, we follow this rule in addressing the admissibility of expert scientific evidence, but never has it been, nor now should it be, adopted as the rule in civil cases. Before the adoption of the Rules of Evidence, no Washington appellate decision had applied *Frye* in a civil case. Since the adoption of the Rules of Evidence in 1979, only four reported civil cases have used a *Frye*-type analysis in applying ER 702 and ER 703 to scientific or medical evidence. *In re Young*, 122 Wn.2d 1, 857 P.2d 989 (1993) (*Frye* applied separately from ER 702 in a civil commitment proceeding); *In re Petersen*, 120 Wn.2d 833, 846 P.2d 1330 (1993) (citing a criminal case, without discussion or comment, for the proposition that in an attorney disciplinary proceeding ER 702 requires expert opinion to be based on an explanatory theory generally accepted in the scientific community); *Intalco Aluminum Corp. v. Department of Labor & Indus.*, 66 Wn. App. 644, 833 P.2d 390 (1992) (holding the general acceptance in the scientific community requirement applies to the methods used by expert medical witnesses, not to their conclusions), *review denied*, 120 Wn.2d 1031 (1993); *Burkett v. Northern*, 43 Wn. App. 143, 715 P.2d 1159 (holding ER 702 allows a trial court to

---

[3]*Frye v. United States*, 293 F. 1013, 34 A.L.R. 145 (D.C. Cir. 1923).

use the *Frye* general acceptance standard to assess the reliability of a theory or methodology propounded in an expert opinion and offered in a novel field), *review denied*, 106 Wn.2d 1008 (1986). These cases do not individually, nor as a group, support the majority's holding that the *Frye* rule applies in civil cases addressing the admissibility of novel scientific evidence.

Additional reasons exist that require a distinction in approaches between civil and criminal cases. *See Reese*, 74 Wn. App. at 557. The primary reason for this distinction arises out of differences in the burden of proof—beyond a reasonable doubt in criminal cases, and a preponderance of the evidence in civil cases. Additionally, in the criminal context where the power of the State stands in marked disproportion to the resources of most defendants, the State should be forced to clear the initial obstacle of general acceptance as described in *Frye*. *Reese*, 74 Wn. App. at 558-59. This higher burden of admissibility is required to protect the liberty interests of defendants. Higher burdens are not required, however, in the civil context because the parties are generally more evenly situated and better prepared to address the evidence of the opposing party. *Reese*, 74 Wn. App. at 559. Because both parties have the resources to present expert testimony on scientific evidence, ER 702 (as discussed *infra*) performs the necessary function of insuring evidentiary reliability and relevance. The *Daubert* analysis of ER 702 provides a more appropriate analytical framework under which to argue and have rulings on the admissibility of scientific evidence.

This case provides a third reason for not applying *Frye* as a preliminary hurdle in civil cases: the difficulty in determining what is or is not novel scientific evidence. The majority, in its effort to assess the novelty of Prolastin augmentation therapy to treat AAT deficiency, demonstrates this difficulty. In support of its determination that Prolastin augmentation therapy is not novel, the majority states, "Prolastin therapy has proven valuable in treating other serum protein deficiencies such as hemo-

philia." Majority at 303. This incorrectly confuses the theory behind Prolastin augmentation therapy with the therapy itself. Augmentation therapy is the process of supplementing a substance found in the blood that is not present or present in an inadequate amount. The lack of certain serum proteins in the blood has been identified as the cause of some medical conditions. For example, patients with hemophilia A suffer from an inadequate supply of the blood serum protein Factor VIII. *See* Leon W. Hoyer, *Hemophilia A*, 330 N. Eng. J. Med. 38 (Jan. 6, 1994). The treatment of hemophilia A involves augmenting the blood with concentrated Factor VIII taken from human donors.

AAT deficiency is also a condition caused by the inadequate amount of a blood serum protein. While both hemophilia and AAT deficiency are caused by abnormal levels of a blood serum protein, the resulting conditions are completely unrelated: hemophilia is a bleeding disorder, while AAT deficiency affects the lungs and is one cause of emphysema. Prolastin is the trade name for purified human AAT drawn from human blood serum. Br. of Appellants at App. 2. Prolastin itself is used to treat only AAT deficiency; Prolastin is not used to treat hemophilia. The theory underlying augmentation therapy is not novel; however, the specific medical use of Prolastin augmentation therapy very well could be considered novel. Prolastin augmentation therapy is being used to treat a different type of condition caused by different blood protein interactions than those in patients with hemophilia. Factor VIII augmentation for hemophiliacs has been used as a treatment since the 1970s and the complex interactions of the proteins that result in the blood's ability to clot have been well documented. *See* Hoyer, at 38. The relationship between AAT deficiency and emphysema, however, was not well understood in 1989, two years after the FDA approved Prolastin for treating AAT deficiency in 1987. *See* American Thoracic Soc'y, *Guidelines for the Approach to the Patient With Severe Hereditary Alpha-1-Antitrypsin Deficiency*, 140 Am. Rev. Respir. Disease 1494, 1494 (1989).

Identifying these differences between Prolastin augmentation therapy and augmentation therapy for conditions such as hemophilia illuminates the difficulties the trial court faced in determining the novelty of Prolastin augmentation therapy. The majority solves this by concluding, "[a]n expert opinion regarding application of an accepted theory or methodology to a particular medical condition does not implicate *Frye*." Majority at 307. Rather than clarifying the applicability of *Frye*, this ruling only raises additional questions. What is the methodology properly being considered—augmentation therapy or Prolastin augmentation therapy? What is the particular medical condition—abnormal blood serum protein levels or AAT deficiency? In this case, it is easy to see how the trial court could reach the conclusion that AAT augmentation therapy is novel.

I would not extend the rule articulated in *Cauthron* to civil cases involving the admissibility of novel scientific evidence. Additionally and independently, a constructive application of ER 702 performs the necessary reliability and relevance assessment required in all cases involving scientific evidence.

### Reliability and Relevance of Scientific Evidence

The issue we need to resolve is whether the trial court applied the correct standard in excluding expert testimony on the effectiveness of Prolastin augmentation therapy for AAT deficiency. Both the majority and the Court of Appeals agree the trial court erred by excluding the testimony under the *Frye* general acceptance standard because the evidence at issue was not novel. Majority at 307. Next, the majority finds that the admissibility of Dr. Fallat's testimony is governed by ER 702, but rejects the Court of Appeals reliance on *Daubert* in establishing a framework for applying ER 702. Majority at 306-08. In applying ER 702, the majority concludes Dr. Fallat's testimony as to the effectiveness of Prolastin augmentation therapy should have been admitted because he was a qualified expert, and

his testimony would assist the jury in determining a fact at issue.[4] Majority at 308-09. This ends the majority's inquiry. The majority does not tell us how to determine the reliability of the evidence on which Dr. Fallat's testimony is based, even though it recognizes that such a reliability assessment is required by ER 702. Majority at 307-08.

Under ER 104 and ER 702, the trial court acts as gatekeeper, assessing the reliability and relevance of all scientific evidence. *Reese*, 74 Wn. App. at 559; *Daubert*, 113 S. Ct. at 2795. A reliability assessment is also implicit in any determination of relevance under ER 402. When considering the admissibility of expert scientific testimony, ER 104(a) and ER 702 require a judge to determine (1) whether the expert is qualified to provide scientific testimony, (2) whether the proposed testimony constitutes scientific knowledge, and (3) whether the proposed testimony will assist the trier of fact in resolving an issue of fact. *See Daubert*, 113 S. Ct. at 2796.

The majority completely fails to address this second step in its approach to applying ER 702. Majority at 308-09. However, it is this second step's determination of "scientific knowledge" that ensures the reliability and relevance of the expert testimony. The determination of "scientific knowledge" requires a two-prong inquiry: (1) whether it is more likely than not the expert's methodology and principles are reliable, and (2) whether those principles and methodology can properly be applied to the facts at issue. *See Daubert*, 113 S. Ct. at 2795-97. The Supreme Court listed four, nonexclusive factors for a trial court to examine in this two-prong reliability evaluation: testing; peer review and publication; known or potential error rate; and general acceptance. *Daubert*, 113 S. Ct. at 2796-97. This inquiry into "scientific knowledge" is

---

[4]The majority also addresses the trial court's concern with the lack of statistical support of the proffered testimony in this case. Majority at 309. I agree with the majority that ER 703 does not require an expert to base an opinion on statistical studies. However, the existence of statistical data can properly be considered in determining the reliability of proposed scientific testimony under ER 702. *Reese*, 74 Wn. App. at 560-61.

required regardless of whether the offered scientific evidence is novel or not. *Daubert*, 113 S. Ct. at 2796 n.11.

In ignoring the two-prong inquiry into "scientific knowledge" required by ER 702 and noted above, the majority fails to offer a method to determine the underlying reliability of Dr. Fallat's testimony and whether the Prolastin studies upon which Dr. Fallat relied are in fact reliable. The better approach, and the one taken in *Daubert* and by the Court of Appeals, is to focus on the reliability of the evidence in all civil cases where the admissibility of scientific evidence is at issue. Under this approach, the general acceptance standard of *Frye* is not abandoned—its purpose and placement is merely changed. In criminal cases, it remains an initial, required, and dispositive inquiry. In civil cases, it becomes one of the nonexclusive factors a court may consider under ER 702 to determine whether proposed expert testimony is based on scientific knowledge, i.e., reliability and relevance.

The majority explicitly tells us that it is declining the opportunity to adopt the reliability test from *Daubert*, but, at the same time, offers trial courts no alternatives for performing this necessary task. Because the Court of Appeals clearly sets forth standards for trial courts to determine the reliability of scientific evidence under ER 702, I would affirm its reasoning and analysis.

SMITH, J., and UTTER, J. Pro Tem., concur with JOHNSON, J.