IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 83689-7-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| THOK S. KHAT, | |
| Appellant. | |

SMITH, C.J. — Thok Khat was convicted of unlawful possession of a firearm in the second degree. On appeal, Khat contends that the court erred by not certifying the State's latent print examiner as an expert in DNA and by limiting the print examiner's testimony. He claims that the court's decision to limit the examiner's testimony interfered with his right to present evidence. He also challenges statements made by the prosecutor during closing arguments, and asserts that his trial counsel was ineffective for not objecting to one of those statements. Finding no error, we affirm.

FACTS

Background

Around midnight on April 11, 2020, Thok Khat was driving northbound on SR-99 in Seattle. Seattle Police Officer Bryan Weber noticed that Khat was driving without headlights and conducted a record check on the car's license plate. Upon discovering that the car's registration had lapsed two and a half years prior, Officer Weber pulled Khat over. When the officer asked Khat for his

license, Khat provided a Washington identification card. A records check revealed that Khat was driving with a suspended license. The records check also showed that Khat was not legally able to possess a firearm due to a prior felony conviction. Khat told Officer Weber that the vehicle belonged to his uncle and that his uncle had not yet registered the car in his name. He also told Officer Weber that he had been living in the car.

Because the car had been unregistered for so long, Officer Weber decided to impound it. He asked Khat to step out of the vehicle and offered to collect Khat's belongings from the car for him. After removing Khat's belongings, Officer Weber conducted an inventory search of the rest of the car and discovered a Glock handgun inside the unlocked glovebox. Because Khat was not legally allowed to possess a firearm, Officer Weber arrested him.

Khat was initially taken to Seattle Police Department's North Precinct for questioning, and then later transferred to King County Jail. While in jail, Khat called a friend and described how he had been pulled over, that the car tabs were expired, that the car had been searched, and that police found something Khat didn't want them to find. Khat's friend told him that he should have left "shorty"[1] with him, and Khat agreed.

Khat was subsequently charged with unlawful possession of a firearm in the second degree.

---

[1] "Shorty" is a slang term for gun, and typically refers to a sawed-off shotgun. See Sawed-Off Shotgun, WIKIPEDIA, https://en.wikipedia.org/wiki/Sawed-off_shotgun [https://perma.cc/2JBY-NYTG].

## Motions in Limine

During motions in limine, the State moved to exclude DNA testimony it anticipated that the defense would seek from its latent print examiner, Amanda Poast. Defense counsel told the court it wanted to elicit testimony that "guns are a good material from which to collect DNA." Defense counsel explained that Poast could qualify as a DNA expert because she had training as a crime scene analyst. Counsel also explained that this testimony would go to the weight and thoroughness of the State's investigation. The trial court reserved ruling on the motion, reasoning that it would need to hear Poast's testimony to determine whether proper foundation existed to qualify her as an expert.

Later on, in the absence of the jury, defense counsel was permitted to ask Poast questions about her qualifications as an expert witness. Poast testified that she had worked as a latent print examiner for the Seattle Police Department for ten years, and that she holds a bachelors degree in biology and a masters degree in forensic science. She also testified that she was familiar with general principles of how DNA transfer works and that she was aware that DNA is best left on textured surfaces as compared to smooth surfaces. Poast stated that this knowledge was based on her experience, educational background, and a two-hour training presented by DNA examiners from the Washington State Patrol (WSP). However, Poast said that she had only ever swabbed for DNA—she had never conducted any DNA analysis. And she stated on cross-examination that DNA testing was not her area of expertise.

The court concluded that while Poast had "some limited education about textured services [sic] and DNA," she was not a reliable DNA expert witness "because she has never analyzed or tested anything that she has swabbed," so "she [did] not have the scientific basis to confirm that two-hour course that in fact guns are reliable places—places to collect DNA from." The court then limited defense's questioning of Poast to whether she swabbed the gun for DNA.

<u>Closing Arguments</u>

During the State's rebuttal in closing arguments, defense counsel lodged several objections. Relevant here are the underlined sentences in the following exchange:

[STATE:] Right. And you have a doubt it's reasonable it's his gun. Who else could have put that gun there? How could Mr. Khat not know that gun was there? Look at all the evidence in its totality, once again including that jail call, and I believe you'll follow your commonsense and find Mr. Khat guilty. And I'll leave you with this, you are not supposed to take, other than being careful and considerate of the evidence, punishment into consideration.

[DEFENSE]: Objection, Your Honor.

THE COURT: Overruled.

[STATE]: <u>So, your job as jurors is to find what the truth is, right?</u> And if he is convicted, if you come back with the guilty verdict, which I think the evidence establishes, it's the judge's determination about a sentence.

Now, <u>Mr. Khat's situation at that time is sympathetic, right. He said he was evicted, and he was living out of his car, right?</u> That's not something that we deal with as jurors here. <u>That's something that if he is convicted can be looked at at sentencing. And you have to trust</u>—

[DEFENSE]: Objection to the references of sentencing, Your Honor. This is improper.

THE COURT: Overruled.

[STATE]:         And you just have to focus on the narrow issue, which is did the State prove beyond a reasonable doubt that Mr. Khat knowingly possessed, constructively possessed that firearm in the car?  And the State has met its burden.  Thank you.

Khat was convicted as charged and sentenced to three months of electronic home detention.  He appeals.

ANALYSIS

Expert Testimony & Right to Present a Defense

Khat asserts that the court erred by prohibiting the latent print examiner from testifying that firearms are good places from which to collect DNA evidence. He claims that this limitation on the print examiner's testimony violated his right to present a defense.  We disagree.

Where a defendant argues that an evidentiary ruling violated their right to present a defense, we apply a two-step standard of review.  State v. Jennings, 199 Wn.2d 53, 58, 502 P.3d 1255 (2022).  First, we analyze the trial court's evidentiary ruling for an abuse of discretion.  State v. Arndt, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019).  Next, we review de novo whether exclusion of evidence violated the defendant's constitutional right to present a defense. Arndt, 194 Wn.2d at 797-98.

1. Exclusion of Expert Testimony

We review a trial court's determination on the admissibility of expert testimony for an abuse of discretion.  Hollins v. Zbaraschuk, 200 Wn. App. 578, 580, 402 P.3d 907 (2017).  A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds.  Wash. State. Phys.

Ins. Exch. & Ass'n v. Fisons Corp., 122 Wn.2d 299, 339, 858 P.2d 1054 (1993). To find an abuse of discretion, we " 'must be convinced that no reasonable person would take the view adopted by the trial court.' " L.M. by & through Dussault v. Hamilton, 193 Wn.2d 113, 135, 436 P.3d 803 (2019) (emphasis and internal quotation marks omitted) (quoting State v. Salgado-Mendoza, 189 Wn.2d 420, 427, 403 P.3d 45 (2017)). And if the basis for the court's ruling is " 'fairly debatable,' " we " 'will not disturb the trial court's ruling.' " Dussault, 193 Wn.2d at 135 (internal quotation marks omitted) (quoting Gilmore v. Jefferson County Pub. Transp. Benefit Area, 190 Wn.2d 483, 494, 415 P.3d 212 (2018)).

The admissibility of expert witness testimony involves a two-step inquiry: (1) whether the witness qualifies as an expert, and (2) whether the testimony would be helpful to the trier of fact. Reese v. Stroh, 128 Wn.2d 300, 306, 907 P.2d 282 (1995). A witness may qualify as an expert "by knowledge, skill, experience, training, or education." ER 702. But an expert witness may not testify about information outside their area of expertise. In re Marriage of Katare, 175 Wn.2d 23, 38, 283 P.3d 546 (2012). When determining whether a witness qualifies as an expert, the court must consider whether the expert has " 'sufficient expertise in the relevant specialty.' " Frausto v. Yakima HMA, LLC, 188 Wn.2d 227, 232, 393 P.3d 776 (2017) (quoting Young v. Key Pharm., Inc., 112 Wn.2d 216, 229, 770 P.2d 182 (1989)). Expert testimony is helpful if it assists "the jury's understanding of a matter outside the competence of an ordinary layperson." Reese, 128 Wn.2d at 308. Unreliable testimony or testimony lacking an adequate foundation is not helpful. Dussault, 193 Wn.2d at 137-38.

6

Here, the court did not abuse its discretion by concluding that Poast was not qualified to testify about whether guns are good places to test for DNA. Although Poast was well-qualified to testify about latent print collection and analysis, she had limited knowledge of DNA collection and analysis. Poast testified that she was "familiar with general principles of how DNA transfer occurs" and was "aware that DNA is best left on textured surfaces as compared to smooth services [sic]." She noted that she knew which items were "more likely" to have DNA on them than not. This knowledge, she testified, came from a two-hour training presented by DNA examiners with the WSP.

However, she explained that the two-hour WSP course only covered where to swab for DNA, it did not involve any forensic analysis of DNA. She also testified that she had never been involved in DNA analysis at her job as a latent print examiner—she had only ever swabbed items for DNA. And though she took a DNA class in graduate school, Poast admitted that she had never done "any work with DNA" in her previous examiner positions and had not engaged in any other study of DNA aside from the two-hour training with WSP. Further, when asked if DNA testing was within her area of expertise, Poast replied, "No." Even considering the two-hour swabbing training, without having actually tested a swabbing sample, Poast did not possess the scientific knowledge to confirm that textured surfaces are indeed good places to swab for DNA. The trial court did not abuse its discretion in concluding that Poast was not qualified as an expert witness and that her testimony would be unreliable, nor by limiting the testimony accordingly.

7

2. <u>Right to Present a Defense</u>

"A criminal defendant's right to present a defense is guaranteed by both the federal and state constitutions." <u>Jennings</u>, 199 Wn.2d at 63; U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. However, this right is not absolute: the State's interest in excluding prejudicial evidence must "be balanced against the defendant's need for the information sought to be admitted." <u>Arndt</u>, 194 Wn.2d at 812. For example, " 'evidence that is repetitive . . ., only marginally relevant, or poses an undue risk of harassment, prejudice, [or] confusion of the issues, may be excluded.' " <u>Jennings</u>, 199 Wn.2d at 63 (alterations in original) (internal quotation marks omitted) (quoting <u>Holmes v. South Carolina</u>, 547 U.S. 319, 326-27, 129 S. Ct. 1727, 164 L. Ed. 2d 503 (2006). And "when the defendant has an opportunity to present [their] theory of the case, the exclusion of some aspects of the defendant's proffered evidence will not amount to a violation of the defendant's constitutional rights." <u>State v. Ritchie</u>, 24 Wn. App. 2d 618, 635, 520 P.3d 1105 (2022). Thus, the defendant's ability to achieve the effect that the excluded evidence would have produced by other means is a factor indicating that their right to present a defense was not violated. <u>See</u> <u>Ritchie</u>, 24 Wn. App. 2d at 635 (ability to achieve same effect indicates that right to confrontation was not violated).

But in some instances involving evidence of high probative value, "it appears no state interest can be compelling enough to preclude its introduction consistent with the Sixth Amendment [to the United States Constitution] and []
art. 1 § 22" of our state constitution. <u>State v. Hudlow</u>, 99 Wn.2d 1, 16, 659 P.2d

514 (1983). For example, in a rape case, evidence as to the circumstances surrounding the alleged rape, specifically that the victim had actively participated in an "all-night drug-induced sex party" was highly probative evidence because it constituted the defendant's entire defense. State v. Jones, 168 Wn.2d 713, 721, 230 P.3d 576 (2010). In contrast, in a felony murder case involving a claim of self-defense, exclusion of a toxicology report showing the victim had methamphetamine in their system at the time of death did not violate the defendant's right to present a defense because the report was "minimally relevant" and the defendant was still able to testify to his theory of the case. Jennings, 199 Wn.2d at 66-67.

Here, the excluded testimony did not preclude Khat from presenting his theory of the case and was not highly probative. When balanced against the State's interest in limiting the prejudicial effects of inaccurate testimony, Khat's right to present a defense was not violated. At trial, Khat's defense focused on the lack of evidence linking him to the gun and the lack of thoroughness in the police's investigation. Even with the limitations on Poast's testimony, Khat was still able to elicit from Poast that she had not swabbed the gun for DNA because police did not request DNA testing and that she did not recover any prints from the gun. That testimony directly supported Khat's theory of the case; that guns might be good places to swab for DNA does not add more to Khat's defense and is thus, not highly probative. And importantly, nothing prevented Khat from offering testimony from another expert witness qualified in DNA analysis.

9

Prosecutorial Misconduct

Khat asserts that the prosecutor committed misconduct by telling the jury it was their job to find the truth and by referencing Khat's sympathetic situation and how it might affect sentencing. He claims that these statements misstated the jurors' role and diminished the jurors' sense of responsibility and that a new trial is warranted. While we agree that the statements were improper, we disagree that either resulted in prejudice requiring reversal.

We review allegations of prosecutorial misconduct for an abuse of discretion. State v. Lindsey, 180 Wn.2d 423, 430, 326 P.3d 125 (2014). Prosecutors have wide latitude to argue reasonable inferences from the evidence and we presume that they act impartially "in the interest of justice." State v. Thorgerson, 172 Wn.2d 438, 443, 448, 258 P.3d 43 (2011). "[T]o prevail on a claim of prosecutorial misconduct, a defendant who timely objects must show that the prosecutor's 'conduct was both improper and prejudicial in the context of the in the context of the entire trial.' " State v. Zamora, 199 Wn.2d 698, 708, 512 P.3d 512 (2022) (internal quotations omitted) (quoting State v. Loughbom, 196 Wn.2d 64, 70, 470 P.3d 499 (2020)). If a defendant fails to object, they must meet a heightened prejudice standard and show that the prosecutor's conduct was " 'so flagrant and ill intentioned that [a jury] instruction would not have cured the [resulting] prejudice.' " Zamora, 199 Wn.2d at 709 (alterations in original) (quoting Loughbom, 196 Wn.2d at 70). "In other words, the defendant who did not object must show the improper conduct resulted in *incurable* prejudice." Zamora, 199 Wn.2d at 709 (emphasis in original). We analyze prejudice by

considering the prosecutor's comments "in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury." State v. Brown, 132 Wn.2d 529, 561, 940 P.2d 546 (1997). And we assume the jury was able to follow the court's instructions. State v. Warren, 165 Wn.2d 17, 28, 195 P.3d 950 (2008).

1. Misstatement of Jurors' Role

Khat contends that the prosecutor's "truth" statement was improper because it misstates the role of the jury. We agree that the statement was improper. The jury's job is not to determine the truth of what happened, but to determine whether the State has proved the charged offenses beyond a reasonable doubt. State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012) (finding prosecutor's "truth" statements improper).

However, because Khat did not object to this statement during closing, he must now meet a higher prejudice burden and demonstrate that this conduct was flagrant and ill-intentioned and resulted in incurable prejudice. He fails to do so. In this case, the jury instructions cured any prejudice. Right after the prosecutor told the jurors they needed to determine the "truth," he also informed them that their role was to determine whether the evidence supported the charge beyond a reasonable doubt. The present case is analogous to Emery. In Emery, the prosecutor told the jury, "Your verdict should speak the truth," and further urged the jury to "speak the truth by holding these men accountable for what they did." 174 Wn.2d at 751. Our state Supreme Court concluded that while improper, these statements could be cured by a proper jury instruction or by a timely

objection. Emery, 174 Wn.2d at 764. The same is true in the present case. The jury was properly instructed on its role and we presume they followed those instructions.

Khat's assertion that the prosecutor's statement affected the outcome of trial is similarly unconvincing. Overwhelming evidence supported the jury's guilty verdict: Khat admitted he had been living in the car; he had many personal belongings in the car and trunk; he admitted that although other people may have been in the car, none of his friends carried guns; and he insinuated in the jail phone call that he should have left the gun with his friend. Thus, while Khat can demonstrate that the prosecutor's statement was improper, he cannot show that it was incurable or prejudicial.

### 2. Diminishing Jurors' Sense of Responsibility

Khat also challenges the following statement that the prosecutor made during closing argument:

> Mr. Khat's situation at that time is sympathetic, right. He said he was evicted, and he was living out of his car, right? That's not something that we deal with as jurors here. That's something that if he is convicted can be looked at at sentencing. And you have to trust—

Khat timely objected to this statement and the court overruled his objection. Thus, we consider whether the statement was improper and if it resulted in prejudice.

It is generally improper for the jury to consider or be informed of the consequences of their verdict. See State v. Bowman, 57 Wn.2d 266, 271, 356 P.2d 999 (1960) (prosecutor's statement that defendant may receive suspended

sentence is improper); State v. Torres, 16 Wn. App. 254, 262, 554 P.2d 1069 (1976) (prosecutor's argument that defendant may receive probation improper). Comments on sentencing "may distract the jury from its function of determining whether the defendant was guilty or innocent beyond a reasonable doubt by informing them, in substance, that it does not matter if their verdict is wrong because the judge may correct its effect." Torres, 16 Wn. App. at 262 (discussing this effect in context of capital cases).

Here, the prosecutor's statement was plainly improper. The prosecutor should not have told the jurors that they didn't need to consider Khat's sympathetic situation. Even if the statement was true, it is not within the province of the jury to consider how its verdict may affect sentencing.

Although the statement was improper, we disagree that it resulted in prejudice or that there was a substantial likelihood the statement affected the jury's verdict. Though distinguishable, Bowman involved similar statements and is instructive here. In Bowman, the prosecutor informed the jury,

> This court, after conviction, can give [the defendant] a suspended sentence, if you convict. That is with [sic] the province and the power of the Court, and I might add, it happens quite frequently.

57 Wn.2d at 271 (alteration in original). Our state Supreme Court noted that while the prosecutor's statement was "both imprudent and largely uncalled for," it "was not so flagrant that its prejudicial effect, if any, could not have been cured by an instruction of the trial court." Bowman, 57 Wn.2d at 271. In this case, Khat fails to demonstrate that the statement resulted in prejudice, and any prejudice

13

that may have occurred was mitigated by the court's instruction to the jury that they were not to consider sentencing.[2]

Moreover, when considered in the context of the entire trial and the charges involved, the statement did not affect the outcome at trial. As previously discussed, the evidence in this case was overwhelming. And the crime involved is not emotionally charged such that the jury would feel inclined to rely on the court to correct the effect of their verdict: Khat was not facing an extended sentence and there were no victims of his crime. Cf. Torres, 16 Wn. App. at 262 (discussing this effect in context of capital cases). Finally, we disagree with Khat's contention that the court's failure to sustain his objections "lent an aura of legitimacy" to the prosecutor's improper statement. The jury was instructed that the lawyers' remarks were not evidence and must be disregarded if not supported by the evidence or the law in the jury instructions.[3] See also Emery, 174 Wn.2d at 759 ("Because jurors are directed to disregard any argument that is

---

[2] Jury instruction 1 states:

You have nothing whatever to do with any punishment that may be imposed in case of a violation of the law. You may not consider the fact that punishment may follow conviction except insofar as it may tend to make you careful.

[3] The relevant provision of jury instruction 1 states:

The lawyers' remarks, statements, and arguments are intended to help you understand the evidence and apply the law. It is important, however, for you to remember that the lawyers' statements are not evidence. The evidence is the testimony and the exhibits. The law is contained in my instructions to you. You must disregard any remark, statement, or argument that is not supported by the evidence or the law in my instructions.

not supported by the law and the court's instructions, a prosecutor's arguments do not carry the 'imprimatur of both the government and the judiciary.' ").

Ineffective Assistance of Counsel

Khat contends that his counsel's failure to object to the prosecutor's statement that the jurors needed to find the truth constituted ineffective assistance of counsel. Because his counsel's failure to object could have been a legitimate trial strategy, we disagree.

Ineffective assistance of counsel claims present a mixed question of fact and law that we review de novo. State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution guarantee the right to effective assistance of counsel. State v. Estes, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). To prevail on an ineffective assistance of counsel claim, a defendant must establish that (1) counsel's performance was deficient, and (2) that deficiency resulted in prejudice. State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). Counsel's performance is deficient if it falls "below an objective standard of reasonableness based on consideration of all the circumstances." State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Prejudice exists "if there is a reasonable probability that except for counsel's errors, the result of the proceeding would have differed." State v. Estes, 193 Wn. App. 479, 488, 372 P.3d 163 (2016). There is a strong presumption that representation was effective. State v. Grier, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). "When counsel's conduct can be characterized as

15

legitimate trial strategy or tactics, performance is not deficient." Kyllo, 166 Wn.2d at 863. For example, "[d]ecisions on whether and when to object to trial testimony are classic examples of trial tactics." State v. Crow, 8 Wn. App. 2d 480, 508, 438 P.3d 541 (2019); see also In re Pers. Restraint of Davis, 152 Wn.2d 647, 717, 101 P.3d 1 (2004) ("A decision not to object during summation is within the wide range of permissible professional legal conduct.").

Here, counsel's failure to object to the prosecutor's statement that jurors must determine the "truth" can be characterized as a legitimate trial tactic. And in the context of the rest of closing argument, it does not appear that defense counsel was deficient because he objected to several other statements made by the prosecutor during closing. We conclude that counsel's decision not to object to this statement does not constitute deficient performance.

Affirmed.

_Smith, C.J._

WE CONCUR:

_Hazelrigg, A.C.J._                _Bowman, J._